No. 2--04--0418

_____

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03--CF--2083 |
| RANDY I. BERRIER, | ) ) ) | Honorable Michael J. Burke, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

_____

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Randy Berrier, appeals his convictions of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2002)) and criminal damage to property (720 ILCS 5/21--1(1)(a) (West 2002)). On appeal, defendant argues that (1) the trial court abused its discretion in reopening proofs and allowing the State to produce additional expert testimony regarding the elements of unlawful possession of a controlled substance; (2) he received ineffective assistance of counsel because his attorney reargued his motion for a directed verdict after the trial court's initial ruling against him; (3) he received ineffective assistance of counsel because his attorney conceded his guilt on the criminal damage to property charge; (4) the State failed to prove him guilty beyond a reasonable doubt of unlawful possession of a controlled substance; and (5) the State failed to prove

him guilty beyond a reasonable doubt of criminal damage to property. For the reasons that follow, we affirm.

Defendant was arrested on August 1, 2003, after two witnesses reported seeing him trying to break into a broken-down Ford Explorer automobile, and, upon his being processed for entry into the Du Page County jail, police discovered narcotics within his possession. He was charged with both crimes and a jury trial was held on January 21, 2004.

Defense counsel began his opening statement to the jury with the following:

"Two things that you can be certain of in this case. And there's no doubt about it. I expect that you all expect I'm going to deny what the [S]tate had to say [in its opening argument] but it's not true. Number 1 [defendant] broke into that vehicle on August 1at [sic], 2003 but we are not contesting that at all. We expect at the end of this case that you will find guilty [sic] [defendant] guilty of criminal damage to property. He went out there that night. He was having a bad day. Decided to break into that car. There's no doubt about that. Number two, that [defendant] did not possession [sic] controlled substance that night."

Jason Coop was the first witness to testify for the State. He testified that, on the night of August 1, 2003, he and his work partner, Edward Salas, were traveling via northbound Interstate 355 in order to reach an Aurora jobsite, when Salas s Ford Explorer stalled due to a transmission malfunction. The malfunction occurred approximately one-quarter of a mile past a tollbooth, and Salas was able to steer the car to the shoulder of the road. Coop said that the two men obtained a ride back to Salas s house, where they picked up a second vehicle so that they could return to the broken-down Explorer. According to Coop, as the two men returned to the broken-down car, he saw a blue van, with its hood open, parked approximately two feet behind the Explorer. Coop testified that, when they pulled in front of the Explorer on the shoulder of the road,

he saw defendant standing, facing toward the front of the Explorer, with his left arm reaching inside the cabin of the Explorer through the space where the right rear passenger window should have been. It appeared to Coop that defendant was trying to unlock the door from the inside, and he noted that the window, along with the rubber seal around the window, had been broken. Coop stated that, when the two men had abandoned the Explorer, its windows were not broken and its doors were locked.

Coop testified that he chased after defendant, who ran to his van, closed the hood, and drove away. Coop returned to Salas's operational car and the two chased defendant for what Coop estimated was approximately 10 minutes. During the chase, they followed defendant as he exited the interstate, and they followed him through two red traffic lights in a city just off the interstate. After the two cars drove through the first red light, a police officer, whom Coop presumed to have seen the cars run the red light, activated his car's lights and attempted to pull over the two cars. The chase continued, according to Coop, until defendant stopped his car in a pizzeria parking lot, jumped out of his van, and broke through a wooden fence to the left of his van as he ran away. Coop stated that, during the chase, he never lost sight of defendant's vehicle.

During his testimony, Salas described his car's malfunction and his and Coop's return to the broken-down Explorer just as Coop had. He testified that, when the two returned to the location of the Explorer's breakdown, he "couldn't see" his "truck because there was a van directly behind it." He noted that he thought the van was too close to his vehicle to have broken down in the same spot. He said that he pulled his car in front of the Explorer and tried to get out of the vehicle but that the door of the vehicle malfunctioned. He testified that he "noticed that somebody was trying to get into" his "Explorer." His recollection continued "I saw the defendant hear [sic] on my passenger side with shatters [sic] glass. I could see it underneath with the reflection of lights when I pulled up." Salas testified that defendant then drove away and Salas and Coop chased him for approximately 10 minutes. He stated that he lost sight of defendant's vehicle for approximately five seconds when it drove behind a warehouse but otherwise never lost sight of it. Salas stated that defendant's car came to

a stop in a pizzeria parking lot, where defendant exited his car and ran through a fence. Salas testified that he owned the broken-down Explorer and that he never gave defendant permission to break the car's window.

Officer Jeff Bean testified next for the State. He testified that, on August 1, 2003, he was employed as a patrol officer for the City of Woodridge, and, at approximately 9 20 p.m. during his patrol that night, he saw a sport utility vehicle and a van traveling at a high rate of speed through a red traffic light. He estimated that the cars were traveling approximately 50 to 60 miles per hour. Bean recalled that he followed the two cars and activated his lights and siren to pull the vehicles over, but they would not stop and they ran through a second red light during the chase. He said that the passenger in the sport utility vehicle, which was following the van, had his arm out the window and was motioning me forward as if to keep going. However, the officer stayed behind both cars. Bean stated that the cars each made two turns before stopping in a parking lot and that, by the time he caught up, the van door was ajar. It appeared to be unoccupied and the two occupants in the victim s vehicle were exiting out. Bean testified that, after speaking with Coop and Salas, he notified his dispatch of the situation and relayed a description of defendant.

Officer Jeff Buck testified next. He stated that he was called to assist Bean during the incident in question. Buck testified that, after looking for approximately 10 minutes, he found defendant walking on a street approximately one block north of the parking lot where defendant had left his van. Buck arrested defendant and transported him back to the pizzeria parking lot. Both Buck and Bean testified that they did not conduct a search of defendant s van.

The State next called Illinois State Trooper Eric Caho to testify. Caho recalled that he was dispatched to the pizzeria parking lot on August 1, 2003, at approximately 9 30 p.m. in response to the events described above. He took defendant into custody, and he warned defendant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 1966 . According to Caho, defendant then recounted his version of events as follows

Defendant told me he just purchased a vehicle the blue van that was in the parking lot. Said sic that he was traveling northbound on 355 that sic he needed to pull over and put some oil in his car or change his oil. He said at this time he was parked behind a white Ford Explorer. He had had his hood up. He said that he was in front of the van area. Apparently he said another vehicle had pulled up in front of the white Ford Explorer which turned out to be the two witnesses and that that was their vehicle. For some reason he said that he fears sic that they were going to beat him up or something that he jumped back in the van and fled the scene.

Caho took defendant to a police substation where defendant wrote the following voluntary statement, which was admitted into evidence with various typographical errors in the original

I Randy got in A Argument with my Borther in law and left There and stop and pot oil in my car and I bruned my Heand and I got mad and I Broke some Buddies wondow on there car and I and very sorry For that and I will pay for The damage.

Signature

Regarding defendant s claim that he had burned his hand prior to breaking Salas s car window, Caho testified that he examined defendant s hand on the night of the incident, and Caho noticed that defendant s hands bore several cuts but no indications of any burns.

Caho explained that he next took defendant to the Du Page County jail. Caho secured defendant in the front seat of his police car. He recalled that defendant, who had been shirtless when he was brought to the police substation, was wearing a tank top that he received at the substation. Caho testified that, before they left for the county jail, defendant asked if he could have his leather coat and cigarettes from within his van. Caho stated that he went to defendant s van, which had been towed to the police substation parking lot, and retrieved a leather coat from the back of the van and a box of cigarettes from the inner breast pocket of the jacket. Caho did not recall seeing any oil cans or oil containers in the van.

Caho testified that he only glanced inside the box of cigarettes, and he counted approximately 17 cigarettes before closing the box lid. Caho returned to his police car, and defendant answered affirmatively when asked if the coat and cigarettes belonged to him. Caho stated that he then placed the box back inside defendant's jacket pocket and the jacket across defendant's lap before transporting him to the jail.

During the jail intake process, Caho handed defendant's jacket to a jail deputy, whom he saw take the box out of the jacket pocket. After a short inspection of the cigarette packet, the deputy informed Caho that he had found possible drugs, and he showed Caho two baggies of suspected narcotics. Caho testified that the deputy handed him the suspected narcotics, which he placed in secure storage in his squad car trunk before transporting them to police headquarters, where he placed them in a locked evidence locker.

During direct examination, Caho agreed that the location on Interstate 355 where defendant's and Salas's cars were parked when the alleged break-in occurred was between two interstate exits that were just over a mile apart.

Deputy Gary Vandermolen next testified for the State. He testified that he was assigned to the receiving area of the Du Page County jail on the night of August 1, 2003, when he processed defendant's intake into the jail. Vandermolen stated that defendant was wearing a leather coat when he arrived and that Vandermolen took it off of defendant in order to examine it. He found a cigarette pack inside one of the pockets, and he partially pulled out the cigarettes so that he could inspect the bottom of the pack. Vandermolen described that he "saw what appeared to be a small piece of tinfoil" and he "saw a small plastic baggie." Vandermolen stated that he handed the materials to Caho upon finding them.

On cross-examination, Vandermolen confirmed that he believed that defendant was wearing his coat, and that Caho was not carrying it, when defendant arrived at the jail. Vandermolen also recalled that defendant was not wearing any type of shirt under his coat, but he could not recall whether defendant was wearing shoes.

After calling an evidence custodian, who testified concerning the chain of custody of the alleged drugs, the State called forensic chemist Christie Kasper to the witness stand as both an occurrence witness and an expert in the field of drug chemistry. She stated that she tested the chemicals found in defendant s possession at the time of his arrest. She removed a small portion of the first chemical and performed two color tests on it. She described a color test as "a preliminary test that is used to indicate whether a controlled substance might be present," and she explained that the test is performed by adding a small drop of color reagent to the substance to be tested. She described a color reagent as "a reagent that we use that it s *sic* a mixture of chemicals that will react with a substance." She testified that the color test was generally accepted in the relevant scientific community. The first color test caused the substance to turn green, which indicated to Kasper that "heroin might be present." [1] A second color test caused the substance to turn purple, which "indicate d" that heroin might be present. Kasper stated that she then performed a confirmatory gas chromatography mass spectrometry GCMS test by "plac ing" a small amount of the sample in a glass vile *sic* and "dilut ing" it with methenamine before injecting it into the instrument. Kasper testified that the GCMS test is generally accepted in the relevant scientific community, and she stated that her test on the first substance in this case established that heroin was present in the sample recovered from defendant.

Kasper similarly tested the second substance recovered from defendant. First, she did a single color test, which caused the substance to turn blue, thus indicating "t hat cocaine maybe *sic*" present. She also performed a GCMS test, during which the substance tested positive for cocaine. Kasper stated that, based on her scientific training, education, and experience, she believed within a reasonable degree of certainty that

---

[1] Defendant was charged only with possession of cocaine, but evidence of his heroin possession was allowed with the limiting instruction that the jury consider it only as relevant to the knowledge element of the cocaine possession charge.

heroin and cocaine were present in the first and second samples, respectively. Defendant made no objection to this testimony at the time it was offered.

After Kasper's testimony finished and some exhibits were admitted into evidence, the State rested its case. As soon as the State rested, defense counsel raised an objection to Kasper's testimony, on the basis that there was no evidence that the GC/MS machine was operating properly and thus that the State had no evidence that the substances tested actually contained heroin and cocaine. The trial judge denied the objection and denied the defense's related motion for a directed verdict on the drug possession charge.

After a short recess, defense counsel again addressed the court regarding his objection to Kasper's testimony and his motion for a directed verdict. He cited People v. Raney, 324 Ill. App. 3d 703 2001, as standing for the proposition that an expert must offer some proof that a GC/MS machine was functioning properly at the time a substance was tested, in order to lay a proper foundation for the expert's conclusions regarding the substance and the GC/MS test. The State responded that the defense objection was not timely, as it came not only after the end of Kasper's testimony, but also after the State had rested its case. The State requested that, if the trial court were to uphold defendant's objection to the testimony, it allow the State to reopen its case instead of granting a directed verdict.

After a brief recess, the trial court ruled that, given the fact that the defense waited to object until after the State closed its case, it would allow the State to reopen its case to establish the proper foundation for Kasper's conclusions. The trial court reasoned that a timely objection would have given the State an opportunity to correct any deficiencies in foundation for Kasper's testimony, and it stated that its ruling was appropriate in the interest of justice and within its discretion.

When Kasper retook the witness stand, the State established more foundation for the conclusions she drew from her tests of the substances. She testified that she knew the identity of each of the reagents she used for the color tests by virtue of the labels placed on her reagent bottles. Regarding the GC/MS test, Kasper

testified that she checks the machine once per week to ensure that it functions properly. She said that she always performs the check on Monday. She testified that the machine was operating properly both before and after the tests on the substances in this case. After the State indicated that it had no further questions of the witness, the defense again objected and sought to strike all of Kasper s testimony as lacking foundation. After a brief discussion outside the presence of the jury, the State proceeded to ask Kasper several more foundational questions. Kasper indicated that, before testing each sample, she  run s  a blank which helps  her  make sure the instrument is running properly,   and that the blanks she ran before the tests in this case indicated no problems with the GCMS machine. Kasper stated her opinion that the GCMS machine was functioning properly at the time she tested the samples found in defendant s possession, and she agreed that all the tests and calibrations she performed were generally accepted in the relevant scientific community.

On cross-examination, Kasper indicated that she did not remember what day of the week she tested the samples in this case, and she stated that she did not have with her a log book that would have established the dates of the calibrations and the tests. She also agreed that the color test is less accurate than the GCMS test and that she could not use the color test alone to say for certain whether cocaine or heroin was present in a sample.

Defendant testified on his own behalf. Defendant described his reason for stopping his van behind Salas s car on the interstate as follows

I was having a little trouble with my van. It leaks oil. I stopped to check it. I opened my hood and I pulled in front of another car at the time. I got out. I checked it. I was having a bad day as it is. Me and my brother-in-law got in an argument and I got out. I burned my  hand accidentally on the hood of the car because it was hot. I got mad. I punched the window out on the      explorer that was in front of me and another car pulled up at the time I was going to leave.

Defendant stated that he left the scene because "they were going to jump on me I'm sure they were." He stated that he drove until the next exit on the interstate in an attempt to get away from Salas and Coop, and he recalled stopping at a pizza place approximately 10 minutes after the chase began. Defendant said that he then ran away, but he came back because, in his words

"I came to the conclusion myself that the officer they are going to be at the scene of the crime and they wouldn't be able to touch me the victim and why am I running away. You know. I just broke a window."

Defendant testified that he was arrested as he walked back to his van, and that, at that time, he apologized to the officer for having broken the Explorer window. Defendant recalled that two police officers were searching his van when he was escorted back to the pizzeria parking lot. Defendant said that, after being taken to the police station and after writing his statement, he asked a state trooper to get his cigarette pack and jacket out of the van for him, and the trooper complied. Defendant stated that the cigarette pack was not in his jacket as Caho had testified but was instead simply in his van. Defendant claimed that he did not put any drugs in the pack and that he was not aware of any drugs in the pack.

On cross-examination, defendant said that he did not pull over during the police chase because he never saw the police car. He also said that he did not see the police when he fled after stopping his van, but he confirmed that he returned to the parking lot because he knew the police were present. He also admitted that his van had no troubles during the 10-minute car chase. Defendant denied the complaining witnesses' assertion that he put his arm in the Explorer's window after breaking it.

After deliberation, the jury found defendant guilty of both criminal damage to property and unlawful possession of a controlled substance. The trial court denied defendant's motion for a new trial and sentenced him to an extended term of four years' imprisonment for the unlawful possession conviction, to run concurrently with

his 364-day sentence for criminal damage to property. After the trial court denied his motion to reconsider the sentence, defendant timely appealed.

Defendant's first argument is that the trial court erred in reopening proofs and allowing the State to produce additional expert testimony regarding the elements of unlawful possession of a controlled substance. At the outset, we must address the State's claim that defendant has waived this argument by failing to raise it in a posttrial motion. It is true, as the State points out, that a defendant who does not object both during his jury trial and in a posttrial motion waives his claim on appeal. People v. Ward, 154 Ill. 2d 272, 293 (1992); People v. Enoch, 122 Ill. 2d 176, 185-86 (1988). However, the plain error doctrine may be invoked in criminal cases to review an error that has not been properly preserved for review (1) where the evidence is closely balanced, or (2) where the error is of such magnitude that the defendant was denied a fair trial. 134 Ill. 2d R. 615; Ward, 154 Ill. 2d at 294. Here, if defendant is correct that the trial court should not have reopened the proofs, then the State would have had insufficient evidence to show that the substances recovered from defendant in fact contained cocaine, because it would have laid no foundation for Kasper's conclusions. See Raney, 324 Ill. App. 3d at 710 (testimony based on results from GCMS machine not admissible without foundation evidence that machine was functioning properly). It is fundamental that the prosecution bears the burden of proving every element of an alleged crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 361, 25 L. Ed. 2d 368, 373-74, 90 S. Ct. 1068, 1071 (1970). Therefore, we address defendant's substantive argument under the plain error doctrine.

Illinois law generally recognizes the power of a trial court to allow a litigant to reopen his or her case in appropriate circumstances. People v. Canulli, 341 Ill. App. 3d 361, 367 (2003). Even after the State has rested its case, the court has the discretion to allow it to put on additional evidence. Canulli, 341 Ill. App. 3d at 367. The exercise of such discretion

will not be reversed absent a clear showing of abuse. Canulli, 341 Ill. App. 3d at 367. Both parties here agree that a trial court's decision to reopen a case for the presentation of further evidence is reviewed for an abuse of discretion.

We find Canulli to be instructive in the current case. In Canulli, the State offered the testimony of a trooper who used a "Lidar" laser unit to determine that the defendant was driving 15 miles per hour over the speed limit. Canulli, 341 Ill. App. 3d at 363-64. At the time the testimony was offered, the defendant objected on the bases that the trooper's determination lacked foundation and was hearsay. The trial court allowed the testimony to continue, and the defendant later moved for a directed verdict because the testimony regarding the laser evidence lacked proper foundation. Canulli, 341 Ill. App. 3d at 364. After being given seven days to respond, the State was allowed to present a bystander's report of an unrelated traffic case in the same judicial circuit, in which the trial court conducted a Frye hearing (see Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)) and determined that evidence of Lidar technology was admissible, scientifically reliable, and an accepted means of obtaining proof of the speed of an automobile in that judicial circuit. Canulli, 341 Ill. App. 3d at 364-65. On appeal, the defendant argued that the trial court abused its discretion in allowing the State to reopen its case to present additional foundational evidence. Canulli, 341 Ill. App. 3d at 367. The appellate court held that the trial court did not abuse its discretion in allowing the State to reopen proofs under the circumstances in that case. Canulli, 341 Ill. App. 3d at 367.

Here, just as in Canulli, the trial court allowed the State to reopen its proofs after a defense motion for a directed verdict on the basis that the State had not laid foundation for conclusions based on a scientific instrument. However, in this case, unlike in Canulli, the

defense did not offer a foundational objection at the time the witness offered her conclusions; thus, the trial court here had yet another reason to allow the State to reopen its proofs. We also note that, in Canulli, there was a chance that the additional evidence from an unrelated proceeding may have come as a surprise to the defendant, but, here, defendant could not have been surprised that Kasper was able to give a foundation for her conclusions upon being recalled to the witness stand. See People v. Cross, 40 Ill. 2d 85, 90 (1968) (trial court did not err in allowing State to reopen proofs after defense motion for directed verdict where new evidence "could not have taken the defendant by surprise"). We find that the facts here offer even more compelling support for the trial court's decision to allow the State to reopen its proofs than was present under the facts in Canulli.

Defendant traces the precedent cited in Canulli back to People v. Parker, 98 Ill. App. 2d 146, 150 (1968), and he argues that the holding in Canulli is based on a long-standing misreading of the Parker case.[2] According to defendant, a close reading of Parker reveals that the trial court allowed the prosecution there to reopen its case only for the purpose of

---

[2]Defendant notes that Canulli cites People v. Myles, 257 Ill. App. 3d 872, 886 (1994), and People v. Faulkner, 64 Ill. App. 3d 453, 457 (1978), which both cite People v. Price, 8 Ill. App. 3d 158 (1972), and Parker, among other cases. Price also relied on Parker.

No. 2--04--0418

introducing further evidence concerning the value of an automobile the defendant was accused of stealing. Defendant's argument continues: "[T]he further evidence produced by the State in Parker did not affect the elemental facts necessary to establish the defendant's guilt or innocence of the underlying theft charge. Rather, the further evidence served as a measure for classifying the underlying theft offense as either a misdemeanor or a felony." (Emphases in original.) We disagree with defendant's interpretation of Parker.

In Parker, the defendant was found guilty of theft of property valued in excess of $150. Parker, 98 Ill. App. 2d at 148. On the issue of the value of the car, the State originally offered only the victim's testimony that he paid $1,300 for the car six months before the theft and that the cost of repairs was $200. Parker, 98 Ill. App. 2d at 149. However, the trial court allowed the State to reopen proofs after both sides had rested so that it could present an automobile sales manager to testify regarding the fair market value of the car at the time it was stolen. Parker, 98 Ill. App. 2d at 150. Contrary to defendant's assertion here that the new evidence was only further proof of an issue, the appellate court in Parker noted that, prior to the sales manager's testimony upon the trial court's reopening proofs, the testimony of the stolen auto's owner as to its cost some six months prior to the theft was not satisfactorily probative of its value on the date of the theft. Parker, 98 Ill. App. 2d at 150. Therefore, the State in Parker did not reopen its case to offer further evidence of an issue already proven; it reopened the case to provide adequate proof of the auto's value when it was stolen, which was an element of the charged crime. Parker, 98 Ill. App. 2d at 150. Further, contrary to defendant's assertion, the value of the stolen car in Parker was an elemental fact necessary to establish the defendant's guilt. Defendant attempts to characterize Parker as involving a guilty verdict and then a classification of the offense as either a misdemeanor or a felony, depending on the value of the car. However, a defendant is not convicted of an underlying charge of theft before the theft is classified; he is convicted of either

misdemeanor theft or felony theft. In order to prove felony theft, the State in *Parker* had to prove, *inter alia*, that the value of the stolen car at the time of the theft was over $150. The additional proof in *Parker* did involve an elemental fact necessary to establish the defendant's guilt or innocence, and we reject defendant's argument that *Canulli* is based on a misreading of precedent.

Defendant also urges that, under *Cross*, a trial court's discretion to open a case for further evidence is limited to formal matters. In *Cross*, the trial court allowed the State to reopen its case after the defendant moved for a directed verdict on the basis that the State had failed to prove the ownership of the building the defendant was accused of burgling. *Cross*, 40 Ill. 2d at 90. The supreme court held that "proof of the corporate ownership was a formal matter and could not have taken the defendant by surprise," and thus it found no prejudicial error or abuse of discretion in the trial court's decision to reopen the case. *Cross*, 40 Ill. 2d at 90. Thus, the supreme court did not announce that a trial court may reopen a case only to allow evidence of formal matters; instead, it noted that the lack of the defendant's surprise at the new evidence led to the conclusion that the trial court did not abuse its discretion. We reject defendant's reading of *Cross* as placing a limitation on the trial court's discretion to reopen proofs in a case.

Defendant also argues that, upon his motion for a directed verdict, the trial court was required to make a finding or direct a verdict in his favor. In support of his argument, defendant cites the mandatory language of section 115--4(k) of the Code of Criminal Procedure of 1963, which states

"When, at the close of the State's evidence ***, the evidence is insufficient to support a finding or verdict of guilty the court may and on motion of the defendant *shall* make a finding or direct the jury to return a verdict of not guilty ***." (Emphasis added.) 725 ILCS 5/115--4(k) (West 2002).

Defendant reasons that, pursuant to the above language, once he presented his motion for a directed verdict, the trial court was obligated by statute to rule on that motion and thus prohibited from delaying its ruling

and reopening the proofs. However, there is no *per se* rule prohibiting a trial court from permitting the State to reopen its case once the defendant has moved for a directed verdict, and section 115--4 k does not create such a rule. *People v. Bennett*, 331 Ill. App. 3d 198, 202 2002 . Instead, t he trial court retains discretion to grant a motion to reopen the evidence even after a motion for directed verdict, and absent an abuse of that discretion, its decision will not be overturned on appeal. *Bennett*, 331 Ill. App. 3d at 202 accord *Myles*, 257 Ill. App. 3d at 886 e ven after the State has rested its case, the court has the power to allow a party to put on additional evidence, even when this evidence is offered to establish the very facts essential for a conviction , quoting *People v. Padfield*, 16 Ill. App. 3d 1011, 1015 1974 , quoting *Price*, 8 Ill. App. 3d at 160. We find no abuse of discretion in the trial court s decision to allow the State to reopen its proofs in this case.

Defendant s second argument is that he received ineffective assistance of counsel because, after the trial court initially denied his motion for a directed verdict, defendant s trial attorney reargued the issue, which led to the trial court s decision to allow the State to reopen its case and present the necessary foundational evidence for Kasper s testimony. According to defendant s theory, he would have been better served if his trial attorney would have remained silent after his initial objection and allowed the trial court to proceed with the trial erroneously, so that defendant could have won a reversal on appeal.

An accused is entitled to capable legal representation at trial. *People v. Wiley*, 165 Ill. 2d 259, 284 1995 . Under the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 1984 , a defendant alleging ineffective assistance of counsel will prevail only where he or she is able to show that 1 counsel s performance fell below an objective standard of reasonableness and 2 there is a reasonable probability that, but for counsel s unprofessional errors, the result of the proceeding would have been different. *People v. Albanese*, 104 Ill. 2d 504, 525 1984 , adopting *Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct.

2052. When reviewing an attorney's performance under the first prong of the *Strickland* test, a reviewing court indulges a strong presumption that the attorney's performance fell within the wide range of reasonable professional assistance. *Albanese*, 104 Ill. 2d at 526, quoting *Strickland*, 466 U.S. at 669, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. A trial counsel's strategic decisions during the course of the proceeding are generally protected by a strong presumption that the attorney's decisions reflect sound trial strategy rather than incompetence. *Wiley*, 165 Ill. 2d at 289. The question of whether defense counsel provided ineffective assistance requires a bifurcated standard of review, wherein a reviewing court must defer to the trial court's findings of fact unless they are against the manifest weight of the evidence but must make a *de novo* assessment of the ultimate legal issue of whether counsel's omission supports an ineffective assistance claim. *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004). Here, the facts surrounding the ineffective assistance claim are undisputed, and the claim was not raised in trial court. Thus our review is *de novo*.

In arguing his trial counsel's ineffectiveness, defendant relies on the special concurrence in *Bennett*, where the specially concurring justice stated that a similar situation presented an "interesting question." *Bennett*, 331 Ill. App. 3d at 204 (Kuehn, J., specially concurring). The special concurrence continued

Is it tactically sound to voice a request for a directed verdict at the close of the State's case when the trial judge possesses the ability to permit additional evidence to cure the defect upon which the directed verdict motion is made? Reasonably effective criminal defense lawyers should know that trial judges are guided by the platitudes [] that "a criminal trial is not a game to win or lose, but a search for the truth in which [] e very effort should be made to achieve justice, whether that results in the conviction or the acquittal of the defendant." [Citation to majority opinion.] They should know that most judges will prefer truth and justice to prevail over a technical omission in proof on the State's part. Ergo, sound legal strategy would seem to commend restraint in raising any challenge [] until after the jury is discharged

and the trial judge no longer possesses the power to assist the prosecution in mending the error of its ways. While some might call such a tactic gamesmanship, timing the revelation of a deficiency in the State's proofs so that it cannot be corrected would be decidedly reasonable strategy. After all, it wins the case. *Bennett*, 331 Ill. App. 3d at 204-05 (Kuehn, J., specially concurring).

While such a maneuver may indeed be a decidedly reasonable strategy, it is a strategy nonetheless, and, as stated, the presumption in favor of counsel's competence is strong in matters of trial strategy. We disagree with defendant that his counsel's persistence in pressing his objection to Kasper's testimony caused his performance to fall below the threshold of reasonable assistance under the first prong of the *Strickland* test. On the contrary, defendant's trial counsel was effective in pressing his argument, and he caused the State to request to reopen its case to address the deficiencies he exposed. Defendant's argument that counsel should not have further pushed the issue presumes that the State would be able to elicit evidence to cure the foundational problem in its evidence. While we know that in retrospect, at the time there was a possibility that the State would not have been able to relocate its witness or that its witness would not have recalled testing the GCMS machine. In that case, counsel's argument would have been quite effective, and it likely would have led to a directed verdict in defendant's favor.

The fact that counsel's argument may have, in the end, precluded defendant from obtaining a technical victory over the State reflects the difference between competing strategies. If counsel had not pressed the issue again and had let the trial court persist in its ruling, then he would have had to take his chances on appeal, with no guarantee that his objection would have been vindicated. Though the *Bennett* special concurrence implies that no competent lawyer would expect a trial judge to grant a motion for a directed verdict under these circumstances, the decision to reopen proofs lies within the discretion of the trial court, which could just as easily evaluate the circumstances of the case and, in the exercise of its discretion, grant the defendant an instant victory over the State. Trial performance is not to be judged from a hindsight perspective. *People v. Albanese*, 125 Ill. 2d

100, 108 1988 . The fact that we can see, in hindsight, that the trial judge here was among most judges, who prefer truth and justice to prevail over a technical omission in proof on the State s part  Bennett, 331 Ill. App. 3d at 205 Kuehn, J., specially concurring   does not demonstrate counsel s incompetence. See Albanese, 125 Ill. 2d at 108   errors in judgment or trial strategy do not establish incompetence .

Defendant s essential contention, that counsel should not have reargued his objection, is akin to a contention that counsel should have inadequately pressed his objection so as to avoid persuading the trial court  while still preserving the issue for review  instead of vigorously pressing the objection. Thus, defendant s premise is that counsel purposely should have made an inadequate argument in order to open the possibility of reversal on appeal. We will not hold that the standard for ineffectiveness operates in such a way, and we reject defendant s second argument.

Defendant s third argument is that he received ineffective assistance of trial counsel because his attorney conceded defendant's guilt on the criminal damage to property charge. The legal standard under Strickland for a showing of ineffective assistance of counsel is detailed above. Here, defendant cannot demonstrate that but for his attorney's admission, even if improper, the result of the trial would have been different. Indeed, as the State points out, the evidence against defendant was overwhelming regarding the criminal damage to property charge. Two witnesses testified that they saw defendant reaching into the Explorer through the broken window. Defendant gave a written statement admitting that he broke the window, and, at trial, he testified that he broke the window. Though defendant argues below that there was no evidence to belie his assertion that his breaking the window was merely an accident, we reject that argument based on Coop s and Salas s testimony. Therefore, notwithstanding his attorney s admission of defendant s guilt on the criminal damage to property charge, the State still presented overwhelming evidence of his

˘19˘

guilt of that charge, and thus defendant cannot demonstrate a reasonable probability that the outcome of the trial would have been different without counsel s admission.

Defendant s fourth argument is that the State failed to prove him guilty beyond a reasonable doubt of unlawful possession of a controlled substance. When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. People v. Collins, 106 Ill. 2d 237, 261 1985 . The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. Collins, 106 Ill. 2d at 261. In order to be convicted of unlawful possession, a defendant must be proven to have knowingly possessed a controlled substance. 720 ILCS 570/402 (West 2002 .

Defendant s first challenge to the sufficiency of the evidence supporting his drug possession conviction is his argument that, even after recalling Kasper to the witness stand, the State was still unable to elicit enough foundational evidence to make Kasper s testimony admissible, and thus there was no evidence that the materials discovered were actually controlled substances. Defendant notes that Kasper did not recall specifically when the GC/MS machine had been tested and that she could not produce her log book to support her assertion that the machine was working properly at the time of defendant s tests. We disagree with defendant s position. As detailed above, Kasper testified that she personally tested the GC/MS machine every Monday to ensure that it was functioning properly and she testified that the machine had no problems during the checks before and after defendant s tests. She also reported that she tested the GC/MS machine with a blank sample before processing each of defendant s samples and that each of those tests showed no problems with the machine. Therefore, the State laid adequate foundation for Kasper s testimony, and, thus, there was sufficient evidence to support the conclusion that the substances defendant was found to possess were, in fact, illegal drugs.

Defendant s second challenge to the sufficiency of the evidence supporting his drug possession conviction is his argument that there was no credible evidence to support the conclusion that he actually possessed the drugs. Defendant points out Caho s testimony that he did not see the drugs in the cigarette pack when he glanced inside, contradictions in Caho s testimony regarding whether defendant had his jacket during jail intake, contradictions between Caho s and Vandermolen s testimony regarding whether Vandermolen removed the cigarettes from the pack, Vandermolen s failure to recall how many cigarettes were in the pack, Vandermolen s testimony that he did not recall whether defendant was wearing shoes and that defendant was wearing the leather jacket but no shirt upon jail intake, defendant s denial, and a statement by the trial court that someone looking into the pack would have discovered the drugs. All of these points challenge the credibility of the witnesses who testified that defendant had the drugs within his possession. The credibility of the witnesses and the weight to be given their testimony are matters exclusively within the province of the jury. Collins, 106 Ill. 2d at 261-62. The jury in this case apparently found the State s witnesses  testimony that defendant possessed the narcotics to be more credible than defendant s denial, and, because that finding has evidentiary support, we will not disturb it on appeal.

Defendant s final argument is that the State failed to prove him guilty beyond a reasonable doubt of criminal damage to property. Again, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. Collins, 106 Ill. 2d at 261. In order to be convicted of criminal damage to property, a defendant must be proven to have knowingly damaged property of another without consent. 720 ILCS 5/21--1(1)(a) (West 2002)).

Defendant s principal argument is that the State presented no proof to contradict his assertion that he accidentally broke the Explorer window, and thus the State did not prove that he knowingly caused the damage. However, Coop testified that, when he saw defendant by the Explorer, it appeared that defendant was trying to

unlock the door from the inside. Salas testified that he noticed that somebody was trying to get into his vehicle. There was also testimony that called into question defendant's assertion that he pulled his van over behind the Explorer only in order to perform repairs defendant admitted that the van performed well during the 10-minute car chase, and Caho testified that the spot at which defendant chose to stop his van was between two interstate exits that were approximately one mile apart. Therefore, viewing the evidence in the light most favorable to the prosecution, we hold that a rational jury could have found that defendant committed criminal damage to property.

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.        Affirmed.

GROMETER, P.J., and CALLUM, J., concur.