# Illinois Official Reports

## Appellate Court

---

### *In re Commitment of Bice*, 2018 IL App (2d) 170148

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF JAMES BICE (The People of the State of Illinois, Petitioner-Appellee, v. James Bice, Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-17-0148 |
| Filed | March 13, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 00-MR-1076; the Hon. Christopher R. Stride, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John Radosevich, of Waukegan, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Michael M. Glick and Daniel B. Lewin, Assistant Attorneys General, of counsel), for the People. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Justices Schostok and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1     In 2010, respondent, James Bice, was adjudicated a sexually violent person (SVP) under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2010)) and committed to the Department of Human Services (DHS). He now appeals a judgment finding no probable cause to hold an evidentiary hearing on whether he is still an SVP (see 725 ILCS 207/65(b)(1) (West 2014)). We affirm.

¶ 2     On December 21, 2000, the State petitioned to have respondent committed as an SVP. The petition alleged as follows. Respondent was 18 years old. In 1995, when he was 15, he committed the aggravated criminal sexual abuse of his three-year-old half-sister. On January 29, 1996, he was adjudicated delinquent and committed to the juvenile division of the Department of Corrections (DOC). Respondent had admitted to sexually fondling his younger cousin when he was six and sexually abusing approximately 100 children before entering the DOC. In January 1997, he was paroled to the Onarga Academy treatment facility, but, in October 1997, he was returned to the DOC, based on his sexually deviant behavior. In May 1998, he was paroled to the Alternative Behavioral Treatment Center, but five months later, he was returned to the DOC, based on his sexually deviant behavior.

¶ 3     The petition continued as follows. On October 5, 2000, Dr. Agnes R. Jonas, a clinical psychologist, evaluated respondent. She diagnosed him with two mental disorders: (1) pedophilia, sexually attracted to both sexes, R/O exclusive type and (2) borderline personality disorder. In her report, Jonas noted the following. Respondent told Jonas that, when he was three years old, his uncle sexually abused him. He started "doing 'sexual stuff' " when he was five and continued these behaviors intermittently. At about age 12 or 13, he started sexually abusing very young children. He told Jonas that he had sexually abused approximately 100 children before he was incarcerated.

¶ 4     In her report, Jonas stated that, based on respondent's mental disorders and criminal history, it was substantially probable that he would commit sexual violence against minors in the future. Jonas also cited respondent's recurrent sexual fantasies, urges, and behaviors, his apparent lack of remorse, and his lack of progress in therapy. Further, based on research studies published in 1996 and 1998, numerous risk factors for reoffending applied to respondent.

¶ 5     Jonas also cited several actuarial risk-assessment tools but conceded that "there are no instruments as yet developed that can be reliably used for juvenile offenders in estimating their risk levels." According to the Rapid Risk Assessment for Sexual Offense Recidivism, respondent was at a high risk of reoffending. According to the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R), respondent was at a moderate risk of reoffending. According to the Static-99, respondent was in "the highest risk category on this instrument." Jonas had considered other factors validated by research studies and analyses, such as respondent's psychological instability, impulsivity, numerous sexually deviant fantasies, wide range of victims, and failure to complete treatment successfully, in addition to his treatment staff's opinion that he was at a very high risk of reoffending. These factors raised him to a "very high risk."

¶ 6     The petition alleged that respondent was an SVP because his mental disorders made it substantially probable that he would engage in future acts of sexual violence (see 725 ILCS 207/5(f) (West 2000)). It requested that he be committed (see *id.* § 35(f)).

¶ 7 On January 23, 2001, at a hearing, Jonas testified consistently with her report. The trial court found probable cause to believe that respondent was subject to commitment. It ordered an evaluation by the DHS.

¶ 8 The cause was continued numerous times over several years. On March 9, 2010, the parties stipulated to the following. Respondent had been adjudicated delinquent based on his 1995 offense. He had committed several other sexually violent acts before being committed to the DOC in 1996. He had been paroled to residential facilities in 1997 and 1998 but was discharged unsuccessfully both times. If called at a hearing, Jonas and Dr. Paul Heaton, two experts in clinical psychology and the evaluation and treatment of sex offenders, would testify that, to a reasonable degree of psychological certainty, respondent suffered from mental disorders that made it substantially probable that he would engage in future acts of sexual violence. At a hearing, the State would produce sufficient evidence to prove beyond a reasonable doubt that he was an SVP.

¶ 9 The parties agreed that respondent would have a dispositional hearing but that first he would be examined by the DHS and a mental-health professional of his choosing; they further agreed that he would be committed to the DHS until he was no longer sexually violent.

¶ 10 On January 20, 2012, Dr. Joseph W. Proctor submitted his final reexamination report, based in part on his interview of respondent on January 6, 2012. Proctor's report noted the following. Respondent initially consented to treatment in 2002, but he participated only briefly before dropping out. He reentered the core treatment program in 2008. After engaging in behavior that interfered with treatment, he was referred to another program, but he did not make sufficient progress; in 2009, he was removed from the core program while still in the second of five phases. He participated in ancillary treatment groups, with relatively positive results. In April 2010, the DHS facility's behavior committee ruled that he had committed a major violation by possessing flash drives containing child pornography. As of his interview, respondent was still trying to reenter the core treatment program.

¶ 11 Proctor stated his opinion that, to a reasonable degree of psychiatric certainty, respondent met the criteria for (1) pedophilia, sexually attracted to both sexes, exclusive type and (2) personality disorder, not otherwise specified, with antisocial and borderline traits. As to the first diagnosis, Proctor noted that, although respondent had committed all of his sexual acts with children before he turned 16, his sexual attraction to children had continued to the present, as shown in part by his interest in child pornography. As to the second diagnosis, Proctor noted respondent's history of sexual violence and institutional-rule violations. He opined that respondent needed the intense treatment that could be provided only in a DHS facility.

¶ 12 On March 7, 2012, respondent's chosen evaluator, Dr. Kirk Witherspoon, submitted his report to the court. Witherspoon's report stated as follows. No reliable risk-measurement tools had been developed for persons, such as respondent, whose sexual misconduct is limited to childhood and early adolescence. The reports of Jonas and Proctor thus were flawed by their use of actuarial tools that are reliable only for adults. Respondent did not currently exhibit "sexual psychopathology." The prior diagnosis of pedophilia was false, because none of respondent's acts with younger children occurred when he was 16 or older. Witherspoon recommended that respondent be discharged from the DHS and "stripped of the 'SVP' label." Alternatively, he recommended conditional release with treatment and oversight in an outpatient setting.

¶ 13    On October 22, 2012, the trial court held a dispositional hearing. Proctor and Witherspoon testified consistently with their reports. Noting respondent's admissions in the 2010 stipulation, as well as his difficulties with treatment, the court continued his confinement.

¶ 14    On October 24, 2013, the State moved for a finding of no probable cause, based on Proctor's reexamination report, which was dated October 21, 2013. In his report, Proctor stated in part as follows. For the period under review, respondent had had two treatment plans. The first was developed on November 1, 2012; on March 27, 2013, his treatment team stated that his attendance had been poor and that he had been cited for fighting, a major rule violation. The second plan was developed on September 20, 2013. Respondent had completed two ancillary treatment groups since the previous treatment-team report. He was still in phase two of the core program.

¶ 15    Proctor's diagnoses of respondent were unchanged from the 2012 report. He also stated that respondent's scores on the Static-99 and the Static-99R placed him in the low-to-moderate category for risk of reoffending; his score on the MnSOST-R placed him in the moderate risk category; he had several nonactuarial factors that increased his risk of recidivism; and none of the protective factors—age, medical condition, and progress in treatment—applied to him. Proctor concluded that respondent remained an SVP and had made insufficient progress to be conditionally released.

¶ 16    On December 17, 2013, respondent petitioned for (1) conditional release (see 725 ILCS 207/60 (West 2012)) and (2) the appointment of Witherspoon as his expert. The court continued all proceedings so that Witherspoon could conduct his evaluation.

¶ 17    On November 19, 2014, the State moved for a finding of no probable cause. The State relied on Proctor's reexamination report, dated October 20, 2014. Proctor's report stated that, for the period under review, respondent's treatment team reported that he had made limited progress. He had displayed numerous behaviors that interfered with treatment, and his levels of commitment and motivation had fluctuated. Proctor's diagnoses were unchanged from the last report. Respondent's score on the Static-99R placed him in the moderate-to-high risk category for reoffending; his score on the Static-2002R placed him in the moderate risk category. Numerous risk factors not used in these tools were also present, and no protective factors applied. Proctor's opinions and recommendations were also unchanged from his prior report.

¶ 18    Witherspoon's report was dated April 5, 2014, and based in part on his interview of respondent on February 28, 2014. It stated in pertinent part as follows. Respondent told him that he had completed various ancillary treatment groups in preparation for participating in the core treatment program. A battery of personality tests administered on respondent for the 2014 evaluation "evidenced no indications toward child molestation," "sexual compulsivity, preoccupation, or hypersexuality," or "noncontact sexual deviancy."

¶ 19    Witherspoon's report reiterated his disapproval of using actuarial tools such as the Static-99 and its successors and the MnSOST-R on persons with no adult records of sexual offending. Witherspoon diagnosed respondent with attention deficit/hyperactivity disorder but not with pedophilia or paraphilia. His treatment had not been "particularly successful," but this was likely because it was based on the false assumption that he was suffering from sexual psychopathology. Witherspoon cautioned that sexual misconduct committed during childhood or adolescence does not predict adult offending. As before, he recommended discharge. Alternatively, he stated, respondent should receive treatment and oversight in an outpatient setting.

¶ 20    On January 28, 2015, after a hearing, the trial court stated as follows. In formulating his diagnoses and recommendations, Proctor had used a wide variety of evidence, including respondent's admissions about prior acts, reports of other acts, respondent's treatment history, actuarial test results, and risk factors that the actuarial tests did not consider. The court denied respondent's petition for conditional release and granted the State's motion for a finding of no probable cause.

¶ 21    On October 29, 2015, the State moved for a finding of no probable cause, based on Proctor's reexamination report of October 19, 2015. The State noted that Proctor had reported that respondent was still in the second phase of the five-phase treatment program. In his report, Proctor also stated as follows. For the period at issue, respondent's treatment team had developed two plans. The first was dated September 18, 2014. The team reported that, since that date, respondent had shown numerous "treatment-interfering" attitudes and behaviors, resulting in his removal from one treatment group. In his other groups, he had fluctuated between positive behavior and negative behavior. The second plan was dated September 3, 2015. The treatment team reported that respondent had continued to fluctuate between positive and negative behaviors.

¶ 22    Proctor's diagnoses of respondent's mental disorders were the same as in his prior report.

¶ 23    Proctor noted that the instructions for the Static-99R and the Static-2002R stated that "they should be used with caution with Males [*sic*] whose most recent sex offense was committed while age 17 [or younger] and who is [*sic*] currently 18 years or more of age." This category included respondent. Further, however, he noted that "[r]esearch has demonstrated that there is meaningful variation in the sexual recidivism rates based on factors not measured by [the] Static-99R." In respondent's case, these factors included respondent's "demonstrated sexualized violence; sexual preoccupation; general self-regulation problems; and *** sense of entitlement."

¶ 24    Proctor then noted the following. On the Static-2002R, respondent scored 6, which is in the moderate risk category; the recidivism rate for offenders with this score was 2.63 times that of the "typical sexual offender (defined as a median score of 3)." Proctor noted that studies had identified other factors, both static and dynamic, associated with recidivism. Respondent had several risk factors "based on these additional sources." These were "Any Personality Disorder," "Child molester attitudes," "Substance abuse," "Any deviant sexual interest," "Sees self at no risk to recidivate," "Sexual abuse," "Low motivation for treatment," "Impulsiveness/recklessness," "Anger problems," and "Intimacy problems." The three recognized protective factors—age, medical condition, and progress in sex-offender-specific treatment—did not apply to respondent. Proctor's recommendations were the same as in his previous report.

¶ 25    The trial court continued the cause several times, in part so that respondent could obtain new counsel. On March 9, 2016, respondent filed a response to the State's motion. The response attacked Proctor's report in numerous respects, including the validity of the actuarial risk-assessment tools. According to respondent, the instructions for the Static-99 stated that it should be used with caution in assessing juvenile offenders, and the instructions for the Static-2002R stated that it was not recommended for use on persons who had committed all of their sexual offenses when they were under 17.

¶ 26 On September 14, 2016, the trial court heard arguments on the State's motion for a finding of no probable cause. The court continued the cause to October 5, 2016, for a ruling. On October 5, 2016, the court continued the cause to November 8, 2016.

¶ 27 On November 7, 2016, respondent filed a motion to reopen the proofs. The motion stated as follows. On September 27, 2016, Dr. Amy Louck Davis reexamined respondent per the Act. On October 12, 2016, she prepared her report for the DHS; on October 19, 2016, a copy of the report was mailed to respondent. Louck Davis's report had been unavailable to respondent at the time of the hearing on the State's 2015 motion, but it was highly relevant to determining probable cause. It cast doubt on Proctor's report in two respects. First, Proctor had diagnosed respondent with pedophilic disorder, but Louck Davis stated that respondent had not met the criteria for this diagnosis, as he had not engaged in sexual behavior with children at least 5 years younger when he was 16 or older. Second, although Proctor's report spent several pages discussing the results of the Static-99R and Static-2002R assessments of respondent, Louck Davis's report stated that no actuarial risk-assessment tools should be used on persons who have committed sexual offenses only before age 17.

¶ 28 Louck Davis's reexamination report was attached to respondent's motion. The report noted the following. On September 7, 2016, respondent's treatment team reported that he had participated well in phase two of the treatment program; he was attentive and showed a strong commitment to treatment. Throughout the period, he "was regarded as having made significant improvements in his group behavior and participation." In his disclosure group, respondent admitted that he had had consensual sexual partners while he was in juvenile detention and had engaged in problematic behaviors while in the DHS treatment facility. He acknowledged making and distributing " 'child pornography.' " However, he was no longer sexually aroused by children; his arousal had " 'matured.' "

¶ 29 Louck Davis's report stated as follows on the "Issue of Mental Disorder." Over time, respondent had been diagnosed with a variety of sexual disorders, showing that examiners had difficulties in coming to conclusions about him. Based on respondent's record and his clinical interview, Louck Davis opined that to a reasonable degree of psychological certainty he met the criteria for (1) unspecified paraphilic disorder, in a controlled environment, and (2) other specified personality disorder, borderline, schizoid, and antisocial traits. As to the first diagnosis, respondent had perpetrated sexual offenses against younger peers when he was under 16 years old; he had violated rules relating to sexual behavior in secure settings and "engaged in voyeurism and exhibitionistic behaviors and described problematic sexual attitudes and beliefs"; and his behavior had historically been hypersexual, although decreasingly so as he had aged. Since turning 16, respondent had not demonstrated sexual behavior with people at least 5 years younger, so he did not meet the criteria for pedophilic disorder, and he had not demonstrated a pattern of sexual arousal to nonconsenting individuals, thus barring a diagnosis of "Other Specified Paraphilic Disorder due to arousal to non-consent." "Nonetheless," the report continued, respondent's "problematic, illegal, and rule-violating sexual behaviors" had "culminated in decades of special needs, negative impact on his functioning, and institutionalization." Louck Davis's diagnosis took into account that respondent had been living in "an institution or under close surveillance where opportunities to engage in paraphilic sexual behaviors [were] restricted."

¶ 30 As to the second diagnosis, Louck Davis noted that respondent had displayed most of the features of borderline personality disorder: identity disturbance with an unstable sense of self,

impulsivity, and recurrent suicidal or self-injurious behavior. He had also displayed several characteristics of schizotypal personality disorder: odd beliefs and distorted cognitions that influenced his behavior, odd thinking and speech, constricted affect, and odd behavior that drew attention to himself. And he had manifested several aspects of antisocial personality disorder: unlawful acts, deceitfulness, and lack of remorse.

¶ 31    Louck Davis's report turned to the "Issue of Risk." This section of the report began:

> "[Respondent] was 13 years old when he committed a criminal sexual assault for which he was adjudicated [delinquent] and there [are] currently no actuarial risk assessment instruments appropriate and ethical for use with individuals who were charged or convicted/adjudicated *only* of sexual assaults that occurred prior to age 17. Thus, a structured clinical judgment approach was used to estimate [his] risk for recidivism." (Emphasis in original.)

¶ 32    Louck Davis explained that, in using this approach, she reviewed recent research on recidivism in sex offenders who offended only before turning age 17, she consulted members of the Association for the Treatment of Sexual Abusers and its guidelines for adolescent practice, and she reviewed respondent's historical records, interview results, and treatment-team reports. Structured clinical judgment was preferable to actuarial measures, which were not reliable. Among the instruments used in structured clinical judgment are the Sexual Violence Risk-20 (SVR-20) and the STABLE 2007.

¶ 33    Louck Davis then summarized the application of her chosen methodology to respondent's case. The SVR-20 is a checklist of 20 risk factors; the level of risk in a given case depends on the combination of factors, not merely the number. For respondent, the following risk factors were present "to a high degree": he had been a victim of sexual abuse, he had committed nonsexual-violent-offense and multiple-sex-offense types, and he lacked a realistic living plan. Applying the STABLE 2007, which "focuses on long-term emotional vulnerabilities as dynamic risk factors," disclosed that 11 such factors raised concerns. Two raised "Serious concern": "the lack of Capacity for Relationship Stability" and "Emotional Identification with Children."

¶ 34    Three protective factors were considered. The first, sex-offender-specific treatment, did not warrant any risk reduction; although respondent had made some progress in therapy, he was still early in the process, his attitudes and behaviors were problematic, and his description of his plans for avoiding reoffending was "undeveloped, non-specific, and minimally related to preventing re-offense [*sic*]." The second factor, a serious and debilitating medical condition, was not present and thus did not warrant any risk reduction. The third factor, age, did not warrant any risk reduction: respondent was only 34.

¶ 35    Louck Davis's report stated as follows under "Risk Summary." Risk levels are customarily set at "*Very Low Risk, Below Average Risk, Average Risk, Above Average Risk, and Well Above Average Risk*" (emphasis in original). Louck Davis considered respondent's level as "Above Average level of risk," based on the "preponderance of risk factors present" and the lack of risk reduction based on any protective factors. Louck Davis noted, "No specific actuarial data is available or appropriate to provide a more specific estimate."

¶ 36    Louck Davis's report stated that, based on his above-average level of risk and his mental disorders, respondent was an SVP. He had "not yet made sufficient progress in treatment to substantially lower his level of risk to be considered for conditional release."

¶ 37    On November 9, 2016, the trial court continued the cause to December 7, 2016. On that date, the State filed a response to respondent's motion to reopen the proofs. The State argued that respondent had two separate "review periods" pending: while the case was continued for the 2015 "review period," the State filed Louck Davis's report for the 2016 "review period." According to the State, the Act sets forth separate and distinct yearly review periods, so the report for the 2016 period was irrelevant to the 2015 period's probable-cause hearing.

¶ 38    The State argued alternatively that the introduction of Louck Davis's report would make no difference to the outcome of the 2015 probable-cause hearing because it would not help respondent any more than had Proctor's report. Both examiners had opined that respondent was still an SVP and required commitment. Proctor had relied partly on actuarial risk-prediction tools and Louck Davis had used other risk-prediction measures, but they ultimately reached similar conclusions and made identical recommendations. Further, their recommendations were based on solid evidence that respondent's condition had not changed, in either review period, as he was still in phase two of the five-phase treatment program, had displayed problematic attitudes and behaviors, and had developed no serious relapse-prevention strategy.

¶ 39    On January 4, 2017, the trial court heard arguments on respondent's motion to reopen the proofs, and it continued the cause. On January 25, 2017, the court denied respondent's motion. The court was "not comfortable taking reports *** that would not have been germane to the 2015 motion and making them germane to the 2015 motion."

¶ 40    On February 8, 2017, after hearing arguments, the trial court granted the State's no-probable-cause motion. Respondent timely appealed.

¶ 41    On appeal, respondent contends first that the trial court erred in refusing to grant his motion to reopen the proofs. Respondent contends that, under section 65(b)(1) of the Act, the court was required to consider the 2016 reexamination report, which was available before it ruled on the no-probable-cause motion. The State argues that the Act did not require the court to consider a report that was filed for a separate review period.

¶ 42    Because respondent's argument is based on statutory construction, which raises an issue of law, our review is *de novo*. See *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 70. Our goal is to effectuate the intent of the legislature and, to do so, we must give the statutory language its plain and ordinary meaning. *Id.*

¶ 43    Respondent initially notes that, under section 55(a) of the Act, if a person has been committed and not discharged, the DHS shall submit a written report to the trial court on the person's mental condition "at least once every 12 months after an initial commitment *** for the purpose of determining whether *** the person has made sufficient progress in treatment to be conditionally released and *** the person's condition has so changed since the most recent periodic reexamination *** that he or she is no longer a sexually violent person." 725 ILCS 207/55(a) (West 2014).

¶ 44    Respondent then turns to section 65(b)(1) of the Act, which, in pertinent part, reads:

> "A person may petition the committing court for discharge from custody or supervision without the Secretary [of Human Services'] approval. At the time of an examination under subsection (a) of Section 55 of this Act, the Secretary shall provide the committed person with a written notice of the person's right to petition the court for discharge over the Secretary's objection. *** If the person does not affirmatively waive

the right to petition, the court shall set a probable cause hearing to determine whether facts exist to believe that *since the most recent periodic reexamination \*\*\**, the condition of the committed person has so changed that he or she is no longer a[n] [SVP]. \*\*\* The probable cause hearing under this Section must be held as soon as practical after the filing of the reexamination report under Section 55 of this Act." (Emphasis added.) *Id.* § 65(b)(1).

¶ 45 Respondent cites *In re Commitment of Rendon*, 2017 IL App (1st) 153201, but we cannot say that it addresses the issue here. There, in 2010, the respondent was granted conditional release, which, after some complications, the appellate court restored in 2014. In 2015, the State moved for a finding of no probable cause, based on a January 2015 report issued by the reexamining expert, Dr. Smith. In February 2015, the respondent's appointed expert, Dr. Wood, issued a report recommending that the respondent's conditional release be continued. *Id.* ¶¶ 5-8. In June 2015, Smith conducted "another annual reexamination" (*id.* ¶ 9) (the date of the previous one is not given in the opinion but was sometime in 2014). Smith recommended a finding of no probable cause to believe that the respondent was no longer an SVP, but he did recommend conditional release. *Id.* ¶ 13. The trial court held a hearing at which the respondent contended that he was no longer an SVP and was thus entitled to a discharge hearing. *Id.* ¶ 14. The trial court granted the State's motion. *Id.* ¶ 16.

¶ 46 On appeal, the respondent contended in part that the 2012 amendment to section 65 that added the phrase "since 'the most recent periodic reexamination' " was unduly restrictive because it required him to rely only on facts occurring since the most recent reexamination (essentially the facts that had occurred within the previous year) on the matter of whether he was still an SVP; in his view, the preamendment statute had not been so restrictive. *Id.* ¶ 21 (quoting Pub. Act 97-1075, § 5 (eff. Aug. 24, 2012) (amending 725 ILCS 207/65)).

¶ 47 The appellate court first held that the amendment applied to what it held was a petition for discharge filed by the operation of law in 2015. *Id.* ¶ 22. The court then stated:

"Moreover, [the] respondent's reading of the statute is itself unduly restrictive since review of a reexamination report does not preclude consideration of a respondent's full mental health and sexual history or relevant historical facts. Indeed, in Dr. Smith's June 2015 report itself, he reviewed the other annual reexamination reports from 2008 to 2014, thus taking them into account. Construing the statute logically, it simply means the court must consider the professional conclusions as to a respondent's status in the most recent report and any changed circumstances. See [*Stanbridge*], 2012 IL 112337, ¶ 72. We agree with the State that the amendment is simply a clarification of what the circuit court was already tasked with determining in any case involving application for discharge or conditional release—*i.e.*[,] whether the respondent's *current status* reflects a mental disorder or that he is *still* a danger to society such that he is substantially probable to reoffend. [Citation.] Even absent the amendment, it is common sense that a court would turn to the most recent professional examination of a respondent to answer this very important public safety question." (Emphases in original.) *Id.* ¶ 23.

¶ 48 Respondent seizes on this passage, especially the emphasized language, to argue that, in his case, the trial court was required to consider the 2016 reexamination report. We do not read *Rendon* so broadly. The trial court there had not delayed a hearing on a no-probable-cause motion or a discharge petition to the point where a new reexamination report had been filed in

the interim between the motion or petition and the decision on it. The issue in *Rendon* was how far back in time from the filing of the motion or petition to go, not whether to go forward in time. The court was not concerned with whether the most recent report is the one that is most recent *at the time of the filing of the motion or petition* or the one that is most recent *at the time of the decision on the motion or petition*.

¶ 49    We return to the issue raised by the unusual facts of this case. We do not agree completely with either party's construction of section 65(b)(1). We conclude that the most reasonable construction that is consistent with fairness to both parties and the orderly administration of the Act is that section 65(b)(1) does not require the trial court to consider a superseding reexamination report that is issued only after the parties have rested, so that all that remains is the trial court's decision. In this event, a request to consider newly generated evidence is subject to the sound discretion that the trial court possesses in deciding a motion to reopen the proofs.

¶ 50    Section 65(b)(1) of the Act requires that, in a case such as this one, the trial court "set a probable cause *hearing to determine* whether *facts exist* to believe" that the person is no longer an SVP. (Emphases added.) 725 ILCS 207/65(b)(1) (West 2014). Similarly, section 65(b)(2) begins, "If the court determines *at the probable cause hearing* *** that *probable cause exists* ***." (Emphases added.) *Id.* § 65(b)(2). The natural construction of this phraseology is that the court must decide whether the requisite facts exist *at the time of the hearing*. The quoted passages do not tell the court that it must decide whether "probable cause exist*ed*" when the State filed its motion. Thus, we do not adopt any rule that the evidentiary basis of the court's decision is locked in on the date that the State files its motion for a finding of no probable cause.

¶ 51    We also do not adopt the State's theory that the Act sets up "review periods" so rigid that they require the trial court to exclude new evidence that arises before the parties have rested at a hearing on a no-probable-cause motion. The Act does not use the term "review period" or any comparable language to create such a limitation.

¶ 52    However, what the Act would have required the trial court here to do in such a situation is not before us. By the time that respondent moved to introduce Louck Davis's report, both he and the State had rested their cases. Thus, the motion was one to reopen the proofs, which, as the State notes, is committed to the sound discretion of the trial court. See, *e.g.*, *General Motors Acceptance Corp. v. Stoval*, 374 Ill. App. 3d 1064, 1077 (2007); *People v. Berrier*, 362 Ill. App. 3d 1153, 1163 (2006).

¶ 53    Because section 65(b)(1) did not impose a legal duty on the trial court to admit the 2016 report, the court did not violate it by excluding the 2016 report. We note that, in his opening appellate brief, respondent does not contend that the court abused its discretion in denying his motion to reopen the proofs. Indeed, he does not contend that his motion was addressed to the court's discretion. Instead, respondent contends that the court erred as a matter of law because it violated a statutory requirement to admit the report. This argument is consistent with the substance of the motion; despite its title, it relied on the argument that section 65(b)(1) required the court to admit the report.

¶ 54    As, at the trial level, respondent did not treat the motion as one committed to the court's discretion, and as, in this court, he does not do so in his initial brief, we conclude that respondent has forfeited any argument that the trial court abused its discretion under case law such as *Stoval* and *Berrier*. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) (arguments not raised

in initial brief are forfeited); *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996) (appellant may not obtain reversal on basis not raised in trial court).

¶ 55 In any event, we would not be able to say that the trial court's refusal to admit the 2016 report was an abuse of discretion. We note that the report became available only because of the extraordinary delay in resolving the State's motion for a finding of no probable cause—and this delay was attributable almost entirely to respondent, who sought substantial continuances in order to obtain new counsel and prepare for the hearing. Further, the 2016 report was not rendered ineffectual or ultimately beyond the trial court's consideration. Instead, it was available for the next hearing, as it would have been had the hearing at issue been held more promptly. Finally, our examination of Louck Davis's report, which reached similar diagnoses and recommendations as did Proctor's, albeit with different methodologies, persuades us that the admission of the report was not crucial, because the result of the hearing likely would not have been different had the report been admitted.

¶ 56 We hold that section 65(b)(1) of the Act did not require the trial court to consider Louck Davis's 2016 reexamination report, which became available only after the parties had rested and the trial court had closed the hearing on the State's no-probable-cause motion.

¶ 57 We recognize that the Act is not altogether clear on the issue that we have addressed. Certainly, policy arguments can be made for either party's position. The consideration of a report that has come out after the parties have rested could enable the court to base its decision on more up-to-date information about the respondent's condition. However, restricting the hearing to whatever reports have been filed by the close of the evidence provides a more orderly procedure, preventing a pileup of reports that must be considered at a single probable-cause hearing. In any event, these policy considerations are for the legislature, which might wish to reexamine the procedures under scrutiny here.

¶ 58 For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 59 Affirmed.