NOTICE

Decision filed 03/17/20. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2020 IL App (5th) 190054-U

NO. 5-19-0054

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 16-CF-285 |
| | ) | |
| NATHAN SCOTT KING, | ) | Honorable |
| | ) | Brian D. Lewis, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Overstreet and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: We find the record is insufficient to determine whether King's counsel was ineffective for not introducing a Child Advocacy Center interview and for not calling a witness to explain how photographs submitted by the State were found on the server of King's employer. The trial court did not err in permitting the State to reopen its case-in-chief to admit proof of King's age at the time of the alleged offense.

¶ 2    Following a bench trial, the defendant Nathan Scott King was convicted of one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)). The trial court sentenced him to 15 years in the Illinois Department of Corrections (IDOC). On appeal, King raises several issues challenging his conviction. King first claims that his counsel was ineffective for failing to introduce the victim's Child Advocacy Center interview into evidence. King next asserts that his counsel was ineffective for failing to call a witness to testify regarding photographs

1

submitted by the State that were found on the server of King's employer. Finally, King challenges that the trial court erred in permitting the State to reopen its case-in-chief to admit proof of King's age after the State had rested its case-in-chief. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4    The State charged Nathan Scott King with two counts of predatory criminal sexual assault of a child, a Class X felony (720 ILCS 5/11-1.40(a)(1) (West 2016)). Count I of the criminal information alleged that King placed his tongue on the sex organ of R.S. for the purpose of the sexual arousal of King or R.S. Count II alleged that King placed his finger on the sex organ of R.S. for the purpose of the sexual arousal of King or R.S. Both counts alleged that King was over 17 and R.S. was under 13. King was convicted of count I at a bench trial. Count II was dismissed following defense counsel's motion for a directed verdict after the presentation of the State's evidence.

¶ 5    On appeal, King has not challenged the sufficiency of the evidence to convict him at trial. The following is a summary of the evidence at trial along with the facts necessary to resolve King's points on appeal.

¶ 6    The victim R.S., her mother Karissa, and R.S.'s father, Ryan, lived across the street from King. Karissa testified that R.S. and King's daughter, M.K., would play together and have sleepovers. On June 16, 2016, R.S., who was six years old at the time, and M.K. had a sleepover at King's house. That night, the two girls laid down on the living room floor, and M.K. fell asleep. R.S. testified that she stayed awake because she "wanted her parents." R.S. told this to King, who was in the kitchen at the time. R.S. testified that King then came into the living room, pulled down R.S.'s pants, and licked her "butt." When asked at trial where her "butt" was on her body, R.S. pointed between her legs to her vaginal area. After King quit licking her, R.S. pulled her pants up.

2

¶ 7    According to mother's testimony, King texted Karissa and told her that R.S. was sad. Karissa sent Ryan to King's house, and Ryan brought R.S. home. Karissa observed that R.S. was sleepy and "kind of sad," but thought she was just homesick. Karissa and Ryan tucked R.S. into bed, and Karissa testified R.S. needed a few extra hugs. The next morning, Karissa woke up and went to work.

¶ 8    Ryan testified that he was eating cereal in the kitchen when R.S. came in and licked his neck. Ryan told R.S. that she should not lick people, and R.S. replied, "Oh, well. Maddy's daddy licked me last night." Ryan asked if R.S. could indicate where King licked R.S., and she pointed to her "private section." Ryan was concerned, so he took R.S. into the living room and began asking her questions. Ryan recorded their conversation on his cell phone. Ryan also called Karissa and asked her to come home. When Karissa arrived, Ryan met Karissa outside and told her what had happened. Karissa went inside, talked with R.S., and recorded their conversation.[1]

¶ 9    Karissa took the recorded conversation she made and went to the police. Karissa and Ryan then took R.S. to the hospital for a sexual assault examination. As part of the examination, R.S.'s external labia and surrounding areas were swabbed. The swab was packaged in a sterile container and given to Detective Barbie Baraddy. Several days later, Karissa took R.S. to the Child Advocacy Center (CAC) for an interview.

¶ 10    Prior to trial, defense counsel had filed a motion to have the victim's CAC interview transcribed. The motion indicated that the State had disclosed an audio/visual copy of the CAC interview and that a transcription would be useful to the court and counsel. The trial court ordered that the CAC interview be transcribed and that an original "shall be filed with the court, with copies

---

[1]The recorded conversations of Ryan and R.S. and Karissa and R.S. were admitted into evidence by stipulation of the parties, but are not a part of the record on appeal.

to the State and Defense Attorneys." The transcript of the CAC interview, however, was never filed with the trial court.

¶ 11    At the commencement of the bench trial October 21, 2018, during opening statement, defense counsel began discussing the CAC interview and why it was important to King's case. The State objected and stated that it did not intend to play the CAC interview, and that no motion to admit the CAC interview into evidence had been filed with the court.[2] Defense counsel responded that she believed the trial court could hear the CAC interview during the course of a bench trial and offered legal authority in support of her argument. The trial court agreed that a hearing needed to be held prior to the introduction of the CAC interview, but told the parties "[w]e'll cross that bridge when we get there."

¶ 12    Before cross-examining R.S., defense counsel stated she intended to use the CAC interview transcript for impeachment purposes, and the trial court said: "Well, why don't we get there." Defense counsel then proceeded to question R.S., who testified that she did not remember the interview at the CAC and had not seen the recording of the interview. During a recess in the State's case, the trial court informed the parties that it had "some thoughts on the CAC interview." Defense counsel, however, informed the trial court that she was not going to seek to admit the CAC interview into evidence. No explanation was offered by defense counsel regarding her decision to forgo using the CAC interview.

¶ 13    At trial, the State also introduced a series of photographs obtained from the server of King's employer. These photographs were obtained as a result of a contact made to Detective Baraddy on June 23, 2016, by King's employer. King's employer had conducted an independent search, which yielded the discovery of photographs which the employer suspected might be helpful in the

---

[2]725 ILCS 5/115-10 (West 2016) requires a hearing outside the presence of a jury.

criminal investigation. Detective Baraddy sent King's employer a subpoena, and Detective Baraddy received various documents, including 11 photographs. The photographs were evidently discovered in King's work email, but Detective Baraddy did not know if they were from the inbox or had been deleted. Defense counsel stipulated that the photographs came from King's employer but requested additional foundation regarding their admissibility into evidence. Karissa and R.S. identified R.S. in several of the photographs which were taken in King's house. Neither Karissa nor R.S. knew who took the photographs. The photographs of R.S. all focused on R.S.'s clothed crotch or backside. None of the photographs showed her face. When the State moved to admit the photographs into evidence, defense counsel did not object.

¶ 14    The State also presented three witnesses from the Illinois State Police Crime Lab to testify about the DNA findings from the sexual assault examination kit. Based on the crime lab witnesses' testimony, the male DNA identified in the swab taken from R.S. matched King's DNA. The witnesses, however, could not verify the fluid or part of King's body that produced the DNA sample.

¶ 15    At the close of the State's evidence, King moved for a directed verdict on both counts of predatory criminal sexual assault of a child. The State agreed that count II should be dismissed, and the trial court dismissed count II. With respect to count I, King argued that R.S.'s report of the offense lacked detail and credibility. The State countered that it had met its burden. King added that the State's DNA evidence did not support the allegation. The following conversation then occurred between the trial court, defense counsel, and the State:

       "THE COURT: The question I have on a Motion for a Directed Verdict, at this time, I have nothing to indicate the age of the defendant.

       [DEFENSE COUNSEL]: You have what, Judge?

[THE STATE]: Your Honor, we did put in–[Y]our Honor, I move to reopen. I believe I can at this point in time.

THE COURT: Ms. Burger?

[DEFENSE COUNSEL]: I'm objecting, Judge. She had–

THE COURT: I think there is case law that allows the reopening. On this situation, I'm going to allow it."

¶ 16    The State then recalled Detective Baraddy, who testified that as part of her investigation, she spoke with King, who was born on September 14, 1972, and was 43 years old at time of the offense. The State also introduced King's passport into evidence which verified his date of birth. Defense counsel did not ask Detective Baraddy any additional questions. The trial court took the motion for a directed verdict under advisement. The trial recessed for the day so that the trial court could listen to the recorded conversations between Karissa and R.S. and Ryan and R.S. When the trial resumed the next day, the trial court denied King's motion for a directed verdict. In the defense's case-in-chief, King presented a DNA expert who indicated that it was plausible that King's DNA found on R.S. could have been the result of a transfer from King's bedsheets or bathroom towels, King's phone or iPad if R.S. had used them, or R.S.'s hands, if she had King's DNA on her hands and scratched herself. The expert admitted that clothing is a barrier to DNA transfer.

¶ 17    King also testified to the events of June 16, 2016, and denied placing his tongue on R.S.'s sex organ. As to the photographs submitted by the State, King testified he did not believe he took the pictures. He stated that his daughter and R.S. often played with his phone and iPad. He believed that either he or M.K. accidentally took the photographs. He also testified that his personal devices were synced together with his work devices, and when he loads an "App" or a photograph on one

6

device, "it goes to all the computers." King could not explain why the photographs submitted by the State were transferred from his employer's server to his personal email.

¶ 18 At the close of all the evidence, the trial court took the case under advisement. On November 6, 2018, the trial court found King guilty on count I. Following a sentencing hearing January 11, 2019, the trial court sentenced King to 15 years in IDOC, with 3 years mandatory supervised release. This appeal follows.

¶ 19                                                    ANALYSIS

¶ 20 Under the circumstances of this case, our analysis for King's points on appeal alleging that defense counsel was ineffective for failing to introduce the CAC interview and failing to call a witness to testify about the photographs found on his employer's server is the same. Therefore, we will address these claims together.

¶ 21 In order to establish ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). Defendants are generally required to raise ineffective assistance of counsel claims on direct appeal if the claims are apparent in the record. *People v. Veach*, 2017 IL 120649, ¶ 46. Claims that could have been raised and considered on direct review are deemed procedurally defaulted. *Veach*, 2017 IL 120649, ¶ 47. Nonetheless, ineffective assistance of counsel claims may sometimes be better suited for collateral proceedings when the record is incomplete or inadequate to resolve the claim on direct review. *Veach*, 2017 IL 120649, ¶ 46. Procedural default does not preclude a defendant from raising a claim on collateral review that depended upon facts not found in the record. *Veach*, 2017 IL 120649, ¶ 47.

7

¶ 22    King first challenges that defense counsel was ineffective for failing to introduce the victim's CAC interview into evidence. Here, the record is inadequate to resolve this claim on direct review. Neither the recorded CAC interview nor the transcript of the interview are part of the record. While the record shows that defense counsel had a copy of the CAC interview and the transcript, she did not use, or attempt to use, the recorded CAC interview or transcript at trial. Thus, we have no ability to review either the recorded interview or the transcript of the interview. The record is also silent as to counsel's reasons for deciding not to use the CAC interview or transcript for impeachment of R.S. or in King's case-in-chief. *Cf. Veach*, 2017 IL 120649, ¶ 51 (finding ineffective assistance of counsel claim was proper on direct review and remanding to appellate court to consider ineffective assistance of counsel claim where the record contained counsel's reason for stipulating to the admission of recorded statements). Therefore, we are unable to review whether the admission of the CAC interview would have affected the outcome of the trial, or whether defense counsel's performance fell below an objective standard of reasonableness.

¶ 23    King also asserted that counsel was unprepared to admit the CAC interview into evidence as evidenced by the fact that defense counsel did not file a motion pursuant to 725 ILCS 5/115-10 (West 2016). At a bench trial, however, a motion and a separate hearing under 725 ILCS 5/115-10 (West 2016) may not be required, depending on the circumstances of the case. See, *e.g.*, *People v. Burnett*, 239 Ill. App. 3d 582, 586 (3rd Dist. 1993); *People v. Balle*, 234 Ill. App. 3d 804, 816 (1st Dist. 1992); and *People v. Roy*, 201 Ill. App. 3d 166, 183 (4th Dist. 1990). In the present case, the trial court indicated that it would take up the CAC interview's admission "when we get there." During a recess in the State's case, the trial court also stated it had "some thoughts on the CAC interview." Defense counsel, however, indicated to the trial court that she was not going to ask to introduce the CAC interview. From the record before this court, we cannot say that defense counsel

8

was unprepared and unable to seek admission of the CAC interview. Indeed, the trial court was apparently willing to offer defense counsel the opportunity to address the issue of whether the CAC interview was admissible during the trial. For whatever reason, defense counsel chose not to pursue the introduction of the CAC interview.

¶ 24    Next, King claims that defense counsel was ineffective for failing to call a witness to explain how the photographs introduced by the State were found on his employer's server. Again, the record is inadequate to address this claim. Defense counsel stipulated to the fact that the photographs were obtained pursuant to a subpoena from King's employer. When the State offered the photographs into evidence, there was no objection by defense counsel. King argues that an unnamed expert or an employee of King's employer could have testified about which of King's devices took the photographs, which device sent the photographs to his employer's server, and how the photographs were "received, processed, and stored." The record, however, is completely silent as to what evidence, if any, an expert or employee of King's employer could offer. Furthermore, the record does not tell us whether defense counsel had interviewed any witnesses or investigated this issue for which King now claims defense counsel was ineffective.

¶ 25    Based on the record before this court, we are unable to determine whether defense counsel's decisions were trial strategy or deficient performance, or whether the evidence might have altered the outcome of the proceedings. In this case, King's claims of ineffective assistance of counsel are better suited for resolution in a collateral proceeding by filing a petition for postconviction relief. In a collateral proceeding under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2016)), both King and the State would have an opportunity to develop a factual record bearing on each of King's issues. See *People v. Bew*, 228 Ill. 2d 122, 135 (2008). As such, we decline to review King's claims of ineffective assistance of counsel on direct review

9

and note King may raise these claims under the Post-Conviction Hearing Act where he may have the opportunity to develop a factual record bearing precisely on his issues. See *People v. McGath*, 2017 IL App (4th) 150608, ¶ 43.

¶ 26 Finally, King challenges that the trial court erred in permitting the State to reopen its evidence to admit proof of King's age after the State had rested its case-in-chief. This claim was not, however, properly preserved for appellate review. While defense counsel objected during trial to the reopening of the State's evidence, this claim was not included in King's posttrial motion. Thus, this claim is reviewable only for plain error. *People v. Ward*, 154 Ill. 2d 272, 294 (1992). Plain error review may be invoked in criminal cases where the evidence is closely balanced or where the error is of such magnitude that the defendant was denied a fair trial. *Ward*, 154 Ill. 2d at 294. If King is correct that the trial court should not have allowed the State to reopen its case, then the State would have insufficient evidence to prove King guilty of predatory criminal sexual assault. Therefore, this court will address King's argument for plain error. See *People v. Berrier*, 362 Ill. App. 3d 1153, 1162 (2nd Dist. 2006).

¶ 27 Generally, Illinois law recognizes the trial court's power to allow a litigant to reopen their case in appropriate circumstances. *Berrier*, 362 Ill. App. 3d at 1162; *People v. Canulli*, 341 Ill. App. 3d 361, 367 (4th Dist. 2003). Whether a case may be reopened for further evidence is within the sound discretion of the trial court. *People v. Bennett*, 331 Ill. App. 3d 198, 201 (5th Dist. 2002). The trial court may do so even after the defendant has moved for a directed verdict. *Bennett*, 331 Ill. App. 3d at 202. Absent an abuse of discretion, the trial court's decision will not be overturned on appeal. *Bennett*, 331 Ill. App. 3d at 201. In considering a motion to reopen the case, the trial court considers a variety of factors, including: (1) the existence of an excuse for the failure to introduce the evidence, *e.g.*, it was inadvertent or a calculated risk; (2) surprise or unfair prejudice

to the adverse party; (3) the importance of the new evidence to the movant's case; and (4) whether any cogent reasons exist to deny the request. *People v. Mandarino*, 2013 IL App (1st) 111772, ¶ 44; *People v. Ruppel*, 303 Ill. App. 3d 885, 894 (4th Dist. 1999).

¶ 28    The record shows that the failure to introduce King's age was due to inadvertence. When the trial court stated that it had no evidence as to King's age, the State responded, "Your Honor, we did put in–[Y]our Honor, I move to reopen. I believe I can at this point in time." Apparently, the State believed it had introduced evidence of King's age at the time of the offense during the State's case-in-chief. Upon realizing its mistake, the State moved to reopen its evidence to prove King's age at the time of the offense. Proof that King was over the age of 17 at the time of the offense was crucial to the State's case because it was a fact required to prove King guilty of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)). Moreover, King cannot claim that the evidence of his age surprised him or caused him to suffer unfair prejudice. He was 43 at the time of the offense and his age was uncontested at trial. Finally, no cogent reasons exist to deny the State's request to reopen its evidence. The record demonstrates that the State inadvertently failed to prove an uncontested, crucial fact prior to resting its case-in-chief. "[A] criminal trial is not a game to win or lose, but a search for truth and justice. Every effort should be made to achieve justice, whether that results in the conviction or the acquittal of the defendant." [Internal citations omitted.] *Bennett*, 331 Ill. App. 3d at 202.

¶ 29    King argues that the trial court acted as an advocate for the State by noting that the trial court did not have proof of King's age at the time of the offense. We disagree. "As a general proposition[,] it is never improper for a judge to aid in bringing out the truth in a fair and impartial manner." *People v. Franceschini*, 20 Ill. 2d 126, 131-32 (1960). It is the trial court's duty to see that justice is done, and, where justice is liable to fail because a certain fact has not been developed

or a certain line of inquiry has not been pursued, it is the trial court's duty to interpose and, either by suggestions to counsel or an examination conducted by the trial court itself, avoid the miscarriage of justice. *Franceschini*, 20 Ill. 2d at 132. In doing so, the trial court must not forget the function of the judge and assume that of the advocate. *Franceschini*, 20 Ill. 2d at 132. Here, the trial court did become an advocate for the State. The trial court merely pointed out that it heard no evidence regarding King's age when considering whether to enter a directed verdict for King. The State, realizing its mistake, moved to reopen its case-in-chief without any suggestion to do so from the trial court. Nothing in the record indicates that the trial court abandoned the role of judge and assumed the role of advocate for the State. Point III is denied.

¶ 30    For the foregoing reasons, we affirm King's conviction.


¶ 31    Affirmed.