NOTICE

Decision filed 03/29/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 200372-U

NO. 5-20-0372

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 19-CF-313 |
| | ) | |
| DENNIS A. HIGGINS JR., | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Welch and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction and sentence on the offense of unlawful use or possession of a weapon by a felon, where defense counsel's failure to object to hearsay testimony neither constituted ineffective assistance of counsel nor amounted to plain error. We vacate defendant's conviction and sentence on the offense of aggravated unlawful use of a weapon under the one-act, one-crime rule.

¶ 2    A jury convicted defendant, Dennis Higgins, of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1) (West 2018)) and unlawful use or possession of a weapon by a felon (*id.* § 24-1.1(a)). The circuit court sentenced defendant to two concurrent terms of 7 and 10.5 years'[1] imprisonment followed by 2 years of mandatory supervised release on both counts. On appeal, defendant contends that he was denied effective assistance of counsel, alleging counsel failed to

_____

[1]The circuit court sentenced defendant to "10 years, and 6 months (or 10.5 years)" in prison.

1

object to damaging hearsay testimony that bolstered the State's case on the key issue of identity, and alternatively, that counsel's failings resulted in plain error. Additionally, defendant argues he is entitled to vacatur of the conviction and sentence for aggravated unlawful use of a weapon under the principles set forth in the one-act, one-crime rule. See *People v. Almond*, 2015 IL 113817, ¶ 47 ("Under [this] rule, a defendant may not be convicted of multiple offenses based on the same physical act."). For the following reasons, we affirm in part and vacate in part.

¶ 3                                            I. Background

¶ 4     We limit our recitation of the facts to those relevant to the issues raised on appeal.

¶ 5     On July 18, 2019, the State charged defendant by information with one count of aggravated unlawful use of a weapon, a Class 2 felony (count I) (720 ILCS 5/24-1.6(a)(1) (West 2018)), and one count of unlawful use or possession of a weapon by a felon, a Class 2 felony (count II) (*id.* § 24-1.1(a)). Count I alleged that defendant, who was previously convicted of unlawful possession of a weapon by a felon (No. 12-CF-300), knowingly carried a pistol on or about his person without being issued a current valid concealed carry license or firearm owner's identification card on or about July 16, 2019. Additionally, count II alleged that defendant, who was previously convicted of unlawful use of a weapon (No. 07-CF-257), knowingly possessed a firearm on his person on or about July 16, 2019.

¶ 6     On January 21, 2020, the matter proceeded to a four-day jury trial. Following nearly two days of *voir dire*, the State presented its case-in-chief on January 22, 2020.

¶ 7     The State first called Officer Jarrod Livingston of the Carbondale Police Department. On July 16, 2019, Livingston responded to reports of gunfire at The Fields apartment complex (Fields Apartments). Upon arrival, Livingston spoke with Michael DePalma, a resident in unit 705 of the 700 building of the Fields Apartments. DePalma informed Livingston that he heard gunfire. After

2

the gunfire ceased, DePalma discovered three 9-millimeter spent shell casings on the ground in front of his apartment door. Livingston also discovered a spent .22-caliber shell casing and one live unfired .22-caliber round near the 900 building of the Fields Apartments. Additionally, Livingston discovered a .22-caliber shell casing and .22 bullet that struck a car parked in the complex "in [the] line of fire between" the 700 and 900 buildings.

¶ 8 The State then introduced the testimony of DePalma, who testified that he heard gunshots on July 16, 2019, while inside of his apartment. After the gunfire ceased, DePalma found shell casings in front of his apartment door.

¶ 9 Detective Aaron Baril of the Carbondale Police Department, the lead detective on the case, next testified. Baril encountered defendant 20 to 30 times over the past 10 years of his career. On July 17, 2019, Baril started his investigation of the shootout. Upon request, Erica Kirby, the manager of the Fields Apartments, provided Baril access to surveillance video footage from July 16, 2019. Baril did not initially recognize defendant; however, it became "obvious" to him that defendant was the shooter after Sergeants Guy Draper and Jarin Dunnigan positively identified defendant.

¶ 10 Baril focused on video footage captured at two different times in the evening on July 16, 2019. In the first video of interest, timestamped at 8:05:08 p.m. (People's Exhibit 2I), several men walked down the middle of the street near the 800 building of the Fields Apartments. The State entered into evidence four still images of defendant captured from the video footage at 8:05:08 (People's Exhibits 3A, 3B, 3C, 3D). Baril testified that all four still images clearly depicted defendant in the daylight, wearing a white, short-sleeve T-shirt with a lanyard around his neck.

¶ 11 In the second video of interest (People's Exhibit 2A), timestamped at 11:44:23 p.m., Robert Sanders pulled a handgun from his waistband. At 11:46:29 p.m., Sanders and defendant stood face-

to-face in the street between the 700 and 900 buildings. At that time, Baril identified defendant's face and confirmed defendant was wearing a short-sleeve, white T-shirt with a lanyard around his neck. Next, at 11:46:47, Sanders reached for defendant's waistline to "pat down" defendant before the two men separated. At 11:47:07 p.m., Sanders walked to the 900 building. Defendant then pulled a handgun from his waistband and walked to the 700 building, at which time defendant's face appeared closer to the surveillance camera. At 11:48:35 p.m., Sanders fired his gun in the direction of the 700 building while defendant took cover. At 11:48:40 p.m., defendant fired his gun three times, as evidenced by "muzzle flash" on the surveillance camera. Defendant then ran up a stairwell of the 700 building. Importantly, Baril testified that defendant appeared "identical" in the still images and the video captured during the shootout. When police arrested defendant on July 18, 2019, Baril testified that defendant was wearing a white, short-sleeve plain T-shirt and a lanyard around his neck, which was similar to his appearance on July 16, 2019.

¶ 12    The State next called Sergeant Guy Draper of the Carbondale Police Department. Draper frequently encountered defendant over the last 10 years of his career. Draper easily recognized defendant in a crowd, due to defendant's unique facial features. Specifically, Draper testified that defendant's eyes appeared "wider apart than some people." Draper also recognized defendant's facial hair, stating that defendant "always" had a mustache and "a little hair underneath his lip with some chin hair." Additionally, Draper recognized defendant's "gestures" and body movements, stating that defendant's "comfortability in [the video] is recognizable to me." Moreover, Draper encountered defendant on three separate occasions in the summer of 2019. First, Draper saw defendant in his squad car during a dayshift sometime between May and late June 2019. Second, on June 27, 2019, Draper spoke with defendant in person for about 12 minutes. Lastly, sometime

4

after June 27, 2019, but before July 16, 2019, Draper saw defendant at Attucks Park in Carbondale with a group of people.

¶ 13    Sergeant Jarin Dunnigan of the Carbondale Police Department testified next. Dunnigan encountered defendant more than 10 times over the last 10 years of his career. Based on prior experience with defendant and after viewing roughly 25 photographs of him, Dunnigan identified defendant in the video footage at 8:05:08 p.m. and 11:46:56 p.m. Dunnigan recognized defendant's goatee and his ear-length dreadlocks. Dunnigan further testified that defendant typically "always has facial hair, [a] goatee, sometimes a bit of a mustache." Following Dunnigan's testimony, the State rested, and defense counsel moved for a directed verdict, which the circuit court denied.

¶ 14    Defense counsel then introduced the testimony of Justin Emery, a detective with the Southern Illinois University Police Department. Emery executed a search warrant for defendant's apartment on July 18, 2019. Emery confirmed that police did not find a handgun or ammunition in defendant's apartment.

¶ 15    Next, defense counsel introduced the testimony of Karimah Mosley-Higgins, defendant's younger sister. Mosley-Higgins admitted that she had been convicted of forgery in 2015. Next, after defense counsel showed Mosley-Higgins video clips of at 11:44:52 p.m., 11:45:45 p.m., 11:46:41 p.m., 11:46:59 p.m., and 11:47:07 p.m., she stated six times that she neither recognized nor knew the individual in the video. In support of her testimony, she testified that she saw her brother "millions" of times over the last 5 to 10 years, and she also claimed that the man in the video walked differently than her brother, displayed different mannerisms and gestures than him, had a different skin tone, and did not have defendant's same tattoos. Next, defense counsel showed Mosley-Higgins four still images captured at 8:05:08 p.m. Mosley-Higgins denied that defendant was the man in the photos. Instead, she testified that the man was "Mike Mike," an individual

Mosley-Higgins personally saw on numerous occasions at the Fields Apartments while he visited his "baby mother." The defense rested.

¶ 16 Following Mosley-Higgins's testimony, the State requested permission to introduce rebuttal evidence. The State sought, among other things, to introduce the testimony of Baril, who would testify that "there's no Mike Mike and certainly no Mike Mike affiliated with anybody at The Fields that [he and the other officers are] aware of." The circuit court granted the State's request, and the State presented the testimony of Detective Baril.

¶ 17 Baril testified that the Carbondale Police Department had a database to keep track of individual names, nicknames, physical descriptions, and photographs of victims, witnesses, individuals of interest, individuals known to frequent different locations, and associates. When tasked with identifying an individual, Baril relied on both the database and other officers to identify suspects. The following colloquy took place between the State and Baril regarding an individual named Mike Mike:

> "Q. So I want to talk about a particular nickname, Mike Mike. Is that familiar to you?
> A. It is not.
> Q. That's not somebody that you know that's on the radar of the Carbondale Police Department?
> A. No.
> Q. That's just your knowledge, did you speak with any other officers at the Carbondale Police Department this afternoon about this Mike Mike?
> A. I did.
> Q. Who did you talk to?
> A. There were five or six detectives in the office at that time. You want specific names?
> Q. Any of them that you can remember the names?
> A. Detective Hamel was there, Detective Bethel, Detective Vaughn, Detective Lee Stewart, Sergeant Kevin Geissler was there. I think that was it.
> Q. These are detectives who are involved with investigations in Carbondale on a regular basis?
> A. Right.
> Q. Are they detectives who are involved in investigations for incidents at The Fields on a regular basis?

6

A. Yes.

Q. Have any of them heard of Mike Mike?

A. No.

Q. Did you search the database at the Carbondale Police Department that you just described for anyone with a moniker Mike Mike?

A. We did.

Q. Did you find anything?

A. No.

Q. Did you speak with the manager of The Fields, Erica Kirby?

A. I did.

Q. Did you ask her—

MR. WEPSIEC [(DEFENSE COUNSEL)]: Objection. Hearsay.

THE COURT: Objection is noted. Overruled. You can answer.

A. I did speak with her.

Q. Was she able to provide you with any information by anyone named Mike?

A. She did not know that nickname.

Q. So based upon all of that, is Mike Mike someone you believe has any connection with The Fields apartment complex?

A. Not that I am aware of, no."

Baril also testified that Kirby, the longtime manager of the Fields Apartments, regularly watched surveillance video footage and was "extremely familiar with everyone that lives there, what they drive, who they're dating, who they're married to, where they work."

¶ 18     On cross-examination, Baril clarified that the database contained only the names of individuals with prior contact with the Carbondale Police Department. Baril then confirmed that the database was not linked with other agencies in Jackson County, Illinois, or with several cities close to Carbondale, including Colp, Murphysboro, Herrin, Marion, and Harrisburg. Baril testified affirmatively that the database was not all-inclusive, thus, the five officers referenced on rebuttal knew only those individuals registered in the database. Additionally, Baril admitted that Kirby worked normal workday hours from 8 a.m. to 5 p.m. As such, it was possible that Kirby was unfamiliar with individuals who frequented the Fields Apartments in the evening hours. Following Baril's testimony, the State rested, and the parties proceeded to closing arguments.

7

¶ 19    During closing arguments, the State indicated that the Carbondale Police Department database was thorough, although it was not "100 percent" in terms of its data collection. However, with reliance on the database, Baril's personal knowledge, and the information Baril garnered from other officers and Kirby, the State believed it was unreasonable that a man named Mike Mike engaged in a shootout at the Fields Apartments on July 16, 2019. Defense counsel did not object. Specifically, the State asked the jury: "[I]s it reasonable to you that a person who engages in a shootout at a public housing project—or public apartment building is someone who has never come into contact with the Carbondale Police Department before?" Next, the State argued that Mike Mike was a "generic" name, implying that Mosley-Higgins's story was not truthful but a "crap" story. Defense counsel did not object.

¶ 20    Defense counsel then argued that Baril's testimony demonstrated that the Carbondale Police Department's database was not thorough but was "limited to Carbondale," especially if Mike Mike had no prior contact with the Carbondale Police Department. Defense counsel also emphasized, based on Baril's testimony, that Kirby did not work past 5 p.m., thus, "[i]f Mike Mike comes at 5:30 [p.m.], she's not going to see him." Defense counsel suggested that Baril's testimony was incredible, where he testified that Kirby regularly watched surveillance video at work, while denying the likelihood that Mosley-Higgins, defendant's sister, lied for defendant.

¶ 21    Following closing arguments and the circuit court's jury instructions, defense counsel renewed defendant's motion for directed verdict, which the court denied. On January 24, 2020, following deliberations, the jury found defendant guilty of aggravated unlawful use of a weapon and unlawful use or possession of a weapon by a felon.

¶ 22    On February 21, 2020, defendant filed a motion for a new trial and a motion to continue sentencing hearing. In his motion for a new trial, defendant raised seven arguments, including (1) a

violation of his right to a speedy trial; (2) that defendant was racially discriminated against, denying him equal protection of the law, when the State used its peremptory challenges to exclude African Americans from the jury; (3) the circuit court erred by allowing the State to play the 9-1-1 recordings; (4) the court erred by admitting surveillance videos and four images of defendant from July 16, 2019, taken at the Fields Apartments; (5) the court erred by providing a non-IPI jury instruction; and (6) the evidence was insufficient to prove defendant guilty beyond a reasonable doubt. The circuit court granted defendant's motion to continue sentencing hearing.

¶ 23    On August 28, 2020, defendant filed a motion for leave to amend his motion for a new trial, which the circuit court granted. In his amended motion for a new trial, defendant argued that the court erred by failing to conduct a hearing in accordance with *People v. Thomas*, 2016 IL 118667, and *People v. Stitts*, 2020 IL App (1st) 171723, which failed to afford defendant the opportunity to properly examine Baril, Draper, and Dunnigan outside the presence of the jury.

¶ 24    Following a hearing on October 15, 2020, the circuit court denied defendant's amended motion for a new trial. That same day, the court sentenced defendant to two concurrent terms of 7 years' imprisonment (count I) and 10.5 years' imprisonment (count II) followed by 2 years of mandatory supervised release on both counts.

¶ 25    On October 15, 2020, defendant filed a timely motion to reconsider sentence, which the circuit court denied on November 2, 2020. This appeal followed.

¶ 26                                    II. Analysis

¶ 27    On appeal, defendant argues he was denied effective assistance of counsel, where counsel failed to object to damaging hearsay testimony that bolstered the State's case on the key issue of identity, and alternatively, that counsel's failings resulted in plain error. Finally, defendant contends that he is entitled to vacatur of the conviction and sentence for aggravated unlawful use

9

of a weapon under the one-act, one-crime doctrine. For the following reasons, we affirm in part and vacate in part. We first address defendant's claim that he is entitled to vacatur, where the State concedes that defendant's convictions violate the one-act, one-crime rule.

¶ 28    A. One-Act, One-Crime Violation

¶ 29    Initially, we note that defendant forfeited this claim by failing to raise this issue with the circuit court. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, plain errors affecting substantial rights may be reviewed on appeal. See *People v. Hicks*, 181 Ill. 2d 541, 544-45 (1998). Plain error allows a reviewing court to consider unpreserved claims of error in specific circumstances when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). As our supreme court has determined, an alleged one-act, one-crime violation and the potential for an excessive conviction affects the integrity of the judicial process, which satisfies the second prong of the plain-error rule. *People v. Harvey*, 211 Ill. 2d 368, 389 (2004).

¶ 30    The application of the one-act, one-crime rule is a question of law, which we review *de novo*. *People v. Robinson*, 232 Ill. 2d 98, 105 (2008). Under the one-act, one-crime rule, a defendant may not be convicted of multiple offenses that are based on precisely the same single physical act. *People v. Johnson*, 237 Ill. 2d 81, 97 (2010). Where a defendant is convicted of two offenses based upon the same single physical act, the conviction for the less serious offense must be vacated. *Id.*

10

¶ 31  With these principles in mind, however, we need not reach the merits of defendant's argument. The State agrees with defendant that the jury convicted him of two offenses based on the same physical act of possessing a handgun on or about his person on July 16, 2019. As such, the State concedes that defendant's conviction and sentence for aggravated unlawful use of a weapon—the less serious offense—should be vacated under the one-act, one-crime doctrine. We agree. Accordingly, we vacate defendant's conviction and sentence for aggravated unlawful use of a weapon.

¶ 32  B. Ineffective Assistance of Counsel

¶ 33  Next, we turn to defendant's argument that he was denied effective assistance of counsel, where counsel failed to object to damaging hearsay testimony that bolstered the State's case on the key issue of identity. Specifically, defendant argues that defense counsel was ineffective for failing to object to Baril's hearsay testimony on rebuttal that five Carbondale police officers did not know Mike Mike. Additionally, defendant acknowledges that defense counsel objected to Baril's testimony concerning Kirby's unfamiliarity with Mike Mike. Defendant asserts, however, that defense counsel was ineffective for failing to preserve his objection in the posttrial motion. Lastly, defendant argues that defense counsel failed to object to the State's use of Baril's hearsay testimony in closing argument, which undermined the confidence in the jury's verdict. We disagree.

¶ 34  We note that defendant raised this ineffectiveness argument for the first time on appeal. However, the ineffectiveness of defense counsel may properly be raised for the first time on appeal. *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 26 (citing *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24). A reviewing court may, however, abstain from deciding an ineffectiveness claim on direct appeal if the record is not properly developed. *Id.* (citing *People v. Veach*, 2017 IL

11

120649, ¶ 46). Here, the record is adequate for consideration of defendant's ineffectiveness claim, which we review *de novo*. *Lofton*, 2015 IL App (2d) 130135, ¶ 24 (citing *People v. Berrier*, 362 Ill. App. 3d 1153, 1166-67 (2006) ("Where, as here, the claim of ineffective assistance was not raised in the trial court, our review is *de novo*.").

¶ 35 A defendant alleging ineffective assistance of counsel must satisfy the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The right to effective assistance of counsel entails "reasonable, not perfect, representation." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). To prevail on a claim of ineffectiveness, the defendant must establish that his attorney's performance fell below an objective standard of reasonableness and that this deficient performance prejudiced him. *Strickland*, 466 U.S. at 688. To establish prejudice, a defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 684. A reasonable probability is one that sufficiently undermines confidence in the outcome of the proceeding. *Id*. The defendant's failure to satisfy either prong of *Strickland* defeats an ineffective assistance claim. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). Thus, a reviewing court may resolve an ineffective assistance claim based upon only the prejudice component because a lack of prejudice renders irrelevant the issue of counsel's performance. *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998).

¶ 36 Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is generally inadmissible unless it falls within an exception. *People v. Lawler*, 142 Ill. 2d 548, 557 (1991) (citing *People v. Carpenter*, 28 Ill. 2d 116, 121 (1963)). The fundamental reason for excluding hearsay is the lack of an opportunity to cross-examine the declarant and test the credibility of the statement through cross-examination. See *People v. Clark*, 52 Ill. 2d 374, 389 (1972). "The determination of whether a statement constitutes inadmissible hearsay does not focus

12

upon the substance of the statement, but rather the purpose for which the statement is being used." *People v. Williams*, 181 Ill. 2d 297, 313 (1998). We review *de novo* questions of whether testimony constitutes hearsay. *People v. Gladney*, 2020 IL App (3d) 180087, ¶ 20 (citing *People v. Crowe*, 327 Ill. App. 3d 930, 936 (2002)).

¶ 37 Detective Baril's testimony on rebuttal was hearsay. Baril testified to the substance of conversations he had with five officers and Kirby concerning their unfamiliarity with an alleged man named Mike Mike. The opinions of Detectives Hamel, Bethel, Vaughn, Lee Stewart, Sergeant Geissler, and Kirby were out-of-court statements offered to prove the truth of the matter asserted—that an individual named Mike Mike was unknown by a litany of individuals who frequented the Fields Apartments. Baril's testimony in rebuttal is inadmissible hearsay in that the defense was not provided an opportunity to cross-examine Kirby and the five officers to test the credibility of their statements, and the record reflects that the hearsay statements fail to satisfy any relevant nonhearsay purpose. We, however, cannot conclude that defendant was prejudiced by this testimony.

¶ 38 Even if we assumed deficiency on the part of defense counsel, defendant has not shown the requisite prejudice. The prejudice prong of the *Strickland* test requires a defendant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Contrary to defendant's argument, the evidence against defendant was substantial. In addition, defendant failed to show that a reasonable probability exists that the verdict would have been different if defense counsel objected to Baril's testimony concerning the five officers and also preserved the objection to Baril's testimony concerning Kirby in a posttrial motion. Instead, the record demonstrates that, even if Baril's testimony was excluded, sufficient evidence existed to convict defendant.

13

¶ 39    First, Baril, Draper, and Dunnigan consistently testified that they knew defendant. Baril testified that he encountered defendant 20 to 30 times in the past 10 years. Draper testified that he frequently encountered defendant over the last 10 years, and that he could easily recognize defendant in a crowd. Draper also testified that he saw defendant on three separate occasions in the summer of 2019, prior to the July 16, 2019, incident. In fact, shortly before July 16, 2019, Draper recognized defendant at Attucks Park in Carbondale with a group of people. Dunnigan testified that he encountered defendant more than 10 times over the past 10 years of his career.

¶ 40    Second, based on their familiarity with his appearance, Draper and Dunnigan consistently testified that they quickly identified defendant in the video and four still images. Draper testified that he recognized defendant's unique eyes, which, to him, appeared "wider apart than some people," as well as defendant's "gestures" and body movements. Dunnigan testified that defendant normally had ear-length dreadlocks, and both officers testified that defendant typically had facial hair with either a goatee or mustache. Draper and Dunnigan's testimony of defendant's typical appearance was consistent with the video and four still images captured on July 16, 2019, and on July 18, 2019, when police arrested him. Baril also testified that all four still images clearly depicted defendant in the daylight, wearing a white, short-sleeve T-shirt with a lanyard around his neck. Importantly, Baril testified that defendant appeared "identical" at 8:05 p.m. in the still images and in the video captured later in the evening. Moreover, similar to his appearance on July 16, 2019, Baril testified that defendant was wearing a white, short-sleeve plain T-shirt and a lanyard around his neck on July 18, 2019, when police arrested him.

¶ 41    Lastly, the State mentioned in closing arguments that Mike Mike was not registered in the Carbondale database and unknown to Baril, the five officers, and Kirby. Additionally, the State argued that Mosley-Higgins's use of the name Mike Mike was a "generic" name, implying that

Mosley-Higgins's testimony was not truthful but a "crap" story. Defendant asserts the State's "inflammatory words" in closing arguments, and defense counsel's failure to object, undermined the confidence in the jury's verdict. We cannot agree. Again, in order to establish prejudice, defendant must prove a reasonable probability existed that, but for counsel's failure to object to the State's use of hearsay statements in closing arguments, the result of the proceeding would have been different. The record supports a finding that even if the jury found credible Mosley-Higgins's testimony regarding a man named Mike Mike, sufficient evidence existed to convict defendant.

¶ 42    In sum, this evidence, taken together, demonstrated that video surveillance footage confirmed that defendant, who was later identified by three officers, pulled a gun from his waistband while he walked to the 700 building. Importantly, approximately 90 seconds later, a gun was fired three times in the direction of the 900 building, where gunfire originated and Sanders—the man defendant confronted in the street two minutes prior—was located. For the foregoing reasons, we cannot conclude that a reasonable probability exists that, but for counsel's alleged failures, the result of the proceeding would have been different. Accordingly, we find defendant was not deprived of his constitutional right to effective assistance of counsel.

¶ 43    C. Plain Error

¶ 44    Alternatively, defendant urges this court to review the circuit court's admission of Baril's hearsay testimony under the first prong of plain-error review.

¶ 45    The plain-error rule bypasses normal forfeiture principles. *Piatkowski*, 225 Ill. 2d at 565. This rule allows a reviewing court to consider unpreserved claims of error in specific circumstances when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it

15

affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* (citing *Herron*, 215 Ill. 2d at 186-87). That is, the first prong "requir[es] a finding that the evidence is so closely balanced that the guilty verdict may have resulted from the error." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 46    We first note that the admission of Baril's improper hearsay testimony was error; however, this does not necessarily warrant reversal. Instead, we must consider whether the error falls within the first prong of the plain-error doctrine, keeping in mind that the burden of persuasion rests with the defendant. See *Herron*, 215 Ill. 2d at 187. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense, along with any evidence regarding the witnesses' credibility. *Id.*

¶ 47    With these principles in mind, we cannot say that the evidence was closely balanced. A person commits the offense of unlawful possession of a weapon by a felon when an individual, having been convicted of a prior felony, knowingly possesses a weapon prohibited by section 24-1 of the Criminal Code of 2012 (720 ILCS 5/24-1.1(a) (West 2018)).

¶ 48    Here, it is undisputed that defendant has a prior felony conviction. With regard to the first element, knowingly possessed a weapon, we start with noting that the State did not present a weapon or ammunition to connect defendant to the shooting. The State, however, presented video surveillance footage and four still images captured on July 16, 2019. The State presented still images of a group of males walking in the daylight at approximately 8:05 p.m. The State also introduced a surveillance video from 11:44 p.m. to 11:49 p.m. that, according to the State's

16

witnesses, depicted the same man, now holding and firing a gun. Baril identified defendant in the video and still images after Sergeant Draper and Dunnigan positively identified defendant.

¶ 49 Similar to Baril, who encountered defendant 20 to 30 times over the last 10 years of his career, Sergeants Draper and Dunnigan also frequently encountered defendant over the last 10 years. As stated above, Draper and Dunnigan quickly identified defendant in the video and still images based on defendant's hair, facial hair, unique facial features, and body language. Additionally, Baril testified that defendant appeared "identical" at 8:05 p.m. and during the shootout later that evening. Moreover, Baril, who was present when police arrested defendant on July 18, 2019, testified that defendant appeared "very similar" on July 16, 2019, and July 18, 2019. On both days, defendant was wearing a white, short-sleeve plain T-shirt and a lanyard around his neck.

¶ 50 The State also presented evidence that defendant and Sanders confronted each other in the street at 11:46:29 p.m. Baril testified that defendant pulled a handgun from his waistband at 11:47:07 p.m. and walked to the 700 building, at which time defendant's face came closer to the surveillance camera. At 11:48:35 p.m., Sanders shot his gun and defendant took cover. At 11:48:40 p.m., defendant shot his gun three times before he ran up a stairwell of the 700 building. The State also presented the testimony of DePalma, a resident in unit 705, who discovered three 9-millimeter spent shell casings on the ground in front of his apartment door immediately after the gunfire ceased. As such, the evidence demonstrated that defendant was near the 700 building when he fired his gun.

¶ 51 Lastly, defendant argues that Mosley-Higgins, his younger sister, knew him "more intimately than the officers who only saw him occasionally." As such, he contends that the jury had to determine whether Mosley-Higgins or the officers were more credible in the identification

17

testimony. We first note that Mosley-Higgins's testimony, which was impeached by her prior conviction of forgery, did not counterbalance the State's evidence stated above. In addition, dissimilar to our supreme court in *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008), and *Sebby*, 2017 IL 119445, ¶ 63, where the outcome of these cases turned on how the finder of fact resolved credibility contests, here, we are unpersuaded that the jury's determination boiled down to the testimony of the officers against Mosley-Higgins. As provided in great detail above, even absent the hearsay testimony, the State presented evidence to corroborate the officers' testimony that defendant was the shooter.

¶ 52    Viewing the evidence in a commonsense manner in the context of the totality of the circumstances, we find the evidence in this case was not closely balanced. Accordingly, where defendant was not prejudiced by the circuit court's admission of Detective Baril's hearsay testimony, we cannot conclude that plain error occurred under the first prong of the plain-error doctrine.

¶ 53                                   III. Conclusion

¶ 54    For the foregoing reasons, we affirm defendant's conviction and sentence on the offense of unlawful use or possession of a weapon by a felon, and we vacate defendant's conviction and sentence on the offense of aggravated unlawful use of a weapon.

¶ 55    Affirmed in part and vacated in part.

18